**MESCALERO APACHE TRIBE,**
**Plaintiff,**

v.

**Fred L. O'CHESKEY, as Commissioner of Revenue of and for the State of New Mexico and his successors in office, the Bureau of Revenue of the State of New Mexico, and the State of New Mexico, Defendants.**

**Civ. No. 76–171–B.**

United States District Court,
D. New Mexico.

Sept. 30, 1977.

As Amended Oct. 19, 1977.

---

4. See Affidavits of James W. Nethercott.

Fettinger & Bloom, George E. Fettinger, Kim J. Gottschalk, Alamogordo, N. M., for plaintiff.

Toney Anaya, Atty. Gen., Jan E. Unna, Daniel H. Friedman, Sp. Asst. Attys. Gen., Bureau of Revenue, Legal Div., Santa Fe, N. M., Victor R. Ortega, U. S. Atty., Ruth Streeter, Asst. U. S. Atty., Albuquerque, N. M., for defendants.

## MEMORANDUM OPINION

BRATTON, District Judge.

This action is another in a series of disputes between the Mescalero Apache Tribe [hereinafter the Tribe] and the State of New Mexico [hereinafter the state], and it, as did its predecessors, involves efforts by the state to assert a right that the Tribe denies exists. In this action, the right at issue is whether the state can levy its gross receipts and compensating tax on monies received by certain contractors for their work upon the Tribe's Inn of the Mountain Gods resort complex, a tribal housing project, and a recreation area and campground. All projects were constructed on the Mescalero Reservation, and all the contractors involved are non-Indian. Most of the contractors involved were issued Indian traders' licenses when they undertook to perform the construction services for which the state is attempting to tax them. Some of the contractors are New Mexico companies, and some are from out-of-state. All of the work performed was for the Tribe or an agency of the Tribe, and the Tribe entered into an indemnity agreement with the contractors providing that it would reimburse them for any gross receipts tax they were required to pay to the state. The contractors have had assessed against them New Mexico gross receipts and compensating taxes, and the Tribe has been denied the opportunity to participate in the administrative hearings before the state's Bureau of Revenue relating to the tax assessments levied against one contractor.

■ It should first be noted that the New Mexico Enabling Act[1] and the state's constitution[2] contain a disclaimer of state jurisdiction and control over Indian lands, and that no state jurisdiction of any kind has been assumed pursuant to *25 U.S.C.A. § 1322.*[3] Indeed, the state concedes that it cannot tax reservation lands or impose an income or gross receipts tax upon Indian income derived from work performed on a reservation. The state's contention is that it can tax non-Indians who perform construction services on a reservation for their receipts derived from such work.[4] The state also contends that the issuance of trader's licenses, as discussed *infra*, was beyond the authority of the defendant officials in the Department of Interior.

■ It should also be noted that the Mescalero Apache Tribe has had a treaty[5] with

---

1. *36 Stat. 557* (1910).

2. N.M.Const. art. 21, § 2.

3. *25 U.S.C.A. § 1322* provides in pertinent part: The consent of the United States is hereby given to any State not having jurisdiction over civil causes of action between Indians or to which Indians are parties which arise in the areas of Indian country situated within such State to assume, with the consent of the tribe occupying the particular Indian country or part thereof which would be affected by such assumption, such measure of jurisdiction over any or all such civil causes of action arising ·within such Indian country or any part thereof as may be determined by such State to the same extent that such State has jurisdiction over other civil causes of action, and those civil laws of such State that are of general application to private persons or private property shall have the same force and effect within such Indian country or part thereof as they have elsewhere within that State.

4. *N.M.Stat.Ann. §§ 72–16A–2, 72–16A–3 K* (Repl.1974) (Supp.1975).

5. The treaty provides that the Tribe shall be exclusively under the laws, jurisdiction, and government of the United States. *10 Stat. 979.*

Because the plaintiff relies on its treaty with the United States to prove that it is exclusively under federal jurisdiction, an effort has been made by the state in the present action to challenge the validity of the treaty. It is not the Court's function to undertake to consider the state's contentions with regard to whether the treaty was signed by proper representatives of the Mescalero Apaches. *United States v. New York Indians,* 173 U.S. 464, 469–70, 19 S.Ct. 1487, 43 L.Ed. 769 (1899); *see generally Lone Wolf v. Hitchcock,* 187 U.S. 553 (1903); *Taylor v. United States,* 44 F.2d 531 (9th Cir. 1930); *United States v. Bridleman,* 7 F. 894 (D.Or.1881). Nor will the Court determine whether the nature of the treaty somehow gives the Mescalero Apache Tribe fewer rights

the United States since 1852 and a reservation since 1873. Its present reservation boundary lines were finalized in 1917 by Executive Order.

The Tribe has a constitutional form of government,[6] approved by the Secretary of the Interior, and consisting of a president who is chief executive, a legislature, which is the tribal council, and a judiciary, which is the tribal court. Under its constitution, the Tribe may regulate and control all business conducted on the reservation. It may enact ordinances for this purpose, including licensing provisions and tax assessments. The Tribe has, in fact, passed licensing and taxing ordinances, but they have not yet been applied to anyone doing any sort of business on the reservation, including the contractors involved in the subject matter of this action.

It is the Tribe's position that there are several reasons why there can be no state taxation under the circumstances of this case. First, it is asserted that such taxation interferes with tribal self-government, since the legal and economic burden of the taxes is upon the Tribe, and since the Tribe itself has the power to and has enacted taxing ordinances covering those persons doing business on the reservation. It asserts that the state's tax does not extend to a situation where the state is unable to grant the privilege for which the tax is imposed, i.e., the privilege of doing business on the reservation can be granted only by the Tribe. It further claims that federal preemption has precluded the state from levying these taxes. Federal preemption is alleged to arise from the Tribe's own ordinances on the subject, as approved by the Secretary of the Interior; from the New Mexico Enabling Act, which exempts Indian land from state taxation and thus tangible property attached to that land; from the federal statutes and regulations relating to Indian trading licenses; from its

1852 treaty, as discussed note 5, *supra*; and the authority given Congress by the United States Constitution, art. 1, § 8, cl. 3, to regulate commerce with the Indian tribes. It is also contended that the state is violating its own statute which provides for a deduction for the sale of tangible personal property to the governing body of an Indian tribe,[7] and that the state may not impose its taxes within a reservation when it provides little or no services within that reservation. Finally, the Tribe asserts with regard to the contractor on the housing project that an agency relationship between it and the contractor precludes state taxation, inasmuch as such purchases as were there involved were made by the Tribe.

### I.

The first issue to be decided is whether the Indian traders' licenses were properly issued to the contractors engaged in the work on the resort complex and the housing project. If the licenses were proper under the circumstances, the matter is at an end, for the relevant federal statutes and regulations leave no room for a state to impose additional burdens upon such traders. *Warren Trading Post Co. v. Arizona Tax Comm'n*, 380 U.S. 685, 85 S.Ct. 1242, 14 L.Ed.2d 165 (1965).

There are marked differences between the nature of the activities undertaken by the contractors in this case and the kind of activities the federal licensing statutes and regulations cover.

*25 U.S.C.A. §§ 261–64* provide for the appointment of traders by the Commissioner of Indian Affairs, give the Commissioner the power to make rules and regulations governing such trade, and specify what goods may be sold to the Indians and what price may be charged for such goods. The regulations promulgated pursuant to Section 261 cover in detail the conditions of

---

than other treaties give to other Indian tribes. The Mescalero Apache Tribe is federally recognized, has been federally given a reservation, and is federally protected where appropriate.

**6.** The Tribe's constitution was adopted pursuant to the Indian Reorganization Act, *25 U.S.C.A. § 476.*

**7.** *N.M.Stat.Ann. § 72–16A–14.9* (Repl.1974) (Supp.1975).

such trade, specifying, for example, that no white person shall be employed as a *clerk* by any Indian trader, unless authorized by the Commissioner;[8] that the *store* of an unlicensed trader or a trader whose license has expired may be closed;[9] that the business of a licensed trader must be managed by the bonded principal, who must *habitually reside upon the reservation* ;[10] and that traders must submit, among other things, the *retail price* of articles sold by them to the superintendent when requested to do so, so that he may determine if the prices are fair and reasonable.[11]

The evidence shows that contractors in the present case entered into contracts with the Tribe to do or build specific things. One contractor did, for example, substantial earth moving. Another built a hotel. Yet another built a golf course. None of the contractors had a permanent business location on the reservation, and they and their employees departed the reservation at the close of each working day. The contractors' regular employees carried out performance of the contracts. At least one contractor asked his suppliers to obtain Indian traders' licenses, which they did. However, they did not come on the reservation, except in some instances where a supplier made deliveries to the contractor on the reservation.

Further, all the negotiations involving the projects and the ultimate contracting for their performance were participated in by the tribal officials, their counsel, Bureau of Indian Affairs officials, the contractors, and at least some of their counsel. The whole matter, the evidence shows, was conducted by experienced, knowledgeable people on a highly sophisticated level. It was hardly a situation such as the federal laws and regulations were designed to cover, i. e., one where the Indian could be at the mercy of the white man in the absence of federal protection.[12]

The Superintendent of the Mescalero Agency testified that the licenses were a means to ascertain who had permission to come onto the reservation and to keep track of what firms would actually be coming on the reservation to work. At a pre-construction meeting the contractors were told by persons representing tribal interests that the principal reason for requiring the traders' licenses was to avoid state tax liability. The former does not bring the licensing here done within the scope of the federal law and regulations, and the latter does not remove it therefrom. What is determinative of the issue is the nature of the work done, the circumstances surrounding its performance, and the persons by whom it was done. Other than to issue traders' licenses to the contracting firms, there was no effort to impose the other requirements of the federal laws and regulations. Nor is there any evidence that it was ever intended that there be, no doubt because they simply did not cover the situation.

■ The action of the Secretary, performed by his delegate the Superintendent of the Mescalero Agency, while entitled to great weight, is subject to judicial review.[13] It is concluded that the provisions of *25 U.S.C.A. §§ 261–64* and *25 C.F.R. §§ 251.1–26* were not intended to cover the commercial transactions here involved, and the Superintendent's decision to issue the licenses to the projects' contractors was beyond his authority under them.

## II.

The question of whether the contractors are otherwise exempt from the state's gross receipts and compensating tax remains. In resolving this issue, the exemptions claimed for the contractors involved in the resort

---

8. *25 C.F.R. § 251.3.*

9. *25 C.F.R. § 251.13.*

10. *25 C.F.R. § 251.14.*

11. *25 C.F.R. § 251.22.*

12. *See generally Rockbridge v. Lincoln*, 449 F.2d 567 (9th Cir. 1971); *United States v. Douglas*, 190 F. 482 (8th Cir. 1911); U.S. Dept. of the Interior, Federal Indian Law, 348–51 (1958).

13. *Rockbridge v. Lincoln*, 449 F.2d 567, at 572.

complex and the campground differ from that of the contractor involved in the housing project, for the Tribe has asserted that the latter was its agent.

The complicated circumstances surrounding the housing project on the reservation resulted from the need to conform to the requirements of Section 23 of the United States Housing Act of 1937, as amended.[14] Under the act, there must be an owner separate from the local housing authority which will administer, for example, tenant eligibility and approval of dwelling units.

Thus a variety of documents were needed to undertake the project. Most of them were executed simultaneously with the closing. First, the Tribe leased 100 parcels of land to its agency, the Mescalero Apache Tribe Housing Authority [hereinafter Housing Authority]. The Housing Authority then assigned its lease to the 100 parcels to a California firm named OGO, Incorporated, which planned the project and arranged financing. OGO became the owner for purposes of conforming to the Housing Act's requirements. The Housing Authority and OGO also entered into an agreement to enter into a lease whereby the Housing Authority would lease the houses to be built from OGO, and OGO and the Housing Authority also entered into a lease agreement of the units.

Shortly before, OGO had entered into a contract with Quiller Construction Company [hereinafter Quiller], another California firm, to built the 100 houses.

OGO, its contractors, and the Housing Authority then entered into a contract, referred to as "Addendum No. 6,"[15] covering

---

14. *42 U.S.C.A. § 1421b.*

15. Item 86 of "Addendum No. 6" provides in pertinent part:

A. The [Mescalero Apache Tribe] has been granted certain exemptions by governmental authority from sales taxes; therefore, it will be required that contract procedures be conducted in a manner to reflect this sales tax credit. Bids which include any items as given in the tax credit materials list herein, must have materials purchase and taxable operation costs segregated from all other costs upon which respective bid is basis (sic). The amounts so segregated shall consist of a separate sum, representing the costs to which a tax is applicable, given in dollars and cents, and shown as a percentage of this sum, the applicable tax which would apply should the tax exempt status of MAT not prevail. The aggregate dollars and cents amounts thus resulting (material taxable sums plus the computed tax sums) shall be a part of, and will be deemed in all contract matters and negotiations to so be included in, the lump sum bid proposal total.

B. Subsequent to the execution of a work contract, in a manner yet to be finalized, a purchase order or equivalent document will be issued bearing the necessary tax exempt authorization, at Contractor's request and to his designated supplier, together with instructions that materials of this category shall be billed direct to, and will be paid by, the MAT Housing Authority directly to the supplier upon evidence of material delivery to Contractor, transport entity or equivalent point of discharge of supplier responsibility.

C. Supplier billings must show a total amount consisting of a sum for taxable material purchase and the correct legal sum, for applicable taxes which would apply to the purchase in a non-exempt situation, each in dollars and cents. The amount which will be paid by the MAT Housing Authority will be the material purchase sum. The amount to be debited (deducted from) the Contractor's amount will be the supplier's total amount as defined above. All materials of the tax credit list used on the project shall be so purchased.

Contractor's accounts will be debited only for the aggregate total amounts of the supplier's billings as defined herein, regardless of the relation these amounts bear, above or below, to the amounts given in the Contractor's bid proposal segregation. Accounting records will be maintained by the MAT Housing Authority for each Contractor account to keep current proper account balances. Reconciliation of these accounts with progress payments accounts will be made by the MAT Housing Authority. The Contractor may request duplicate billings from his suppliers as his record needs require.

D. It is hereby expressly stated and agreed upon that the procedures herein given are to facilitate accounting of the tax exempt relief to be granted the MAT only, and no other responsibility shall accrue to the MAT Housing Authority beyond those stated herein. Responsibility for correctness of quantity, delivery and conditions of material reaching the Contractor, unloading, storage, protection at the site, installation and all other foreseen or unforeseen hazards peculiar to the construction industry or this project in particular, and including all specifications and other contract documents, these shall prevail and be unencumbered by the provisions of this document.

E. *TAX CREDIT MATERIALS.* Owner reserves the right to add additional items, refer to

the scope of the work and providing for a procedure designed to utilize the Tribe's tax-exempt status to avoid payment of state taxes by the contractor, his suppliers, and his subcontractors. Tax exempt authorization documents were to be issued to all, and materials were to be billed directly to and paid for by the Tribe.

Financing was provided by the First National Bank of Albuquerque, which looked for repayment to the proceeds from the sale of tax-exempt bonds issued by the Housing Authority and ultimately sold by a New York brokerage firm, with the bank acting as trustee in the matter. Both interest and principal on the bonds were to be furnished by the United States through the use of annual contributions paid by the Department of Housing and Urban Development pursuant to a contract between the United States of America and the Housing Authority. The bonds were not a debt of either the Tribe or the Housing Authority.

OGO relinquished its leasehold interest in the project to the Housing Authority by quitclaim deed in 1973. OGO charged no fee for its services in connection with the project. The project had been undertaken with a donative intent, and the surplus money remaining from the bond issue over and above the cost of the job was left with the Housing Authority.

The state's tax act makes construction activities a service, the gross receipts from which are taxable under the act.[16] It also makes all tangible personal property involved in such activities part of such service.[17] If the Tribe's claim is proper that Quiller was its agent for the purchase of materials used in the housing project, then the second provision could have no possible application to Quiller, for the act provides for a deduction from gross receipts for sales

of tangible personal property to an Indian tribe.[18]

The state relies primarily upon the contract between OGO, as owner, and Quiller, as contractor, pointing to the fact that under that contract Quiller was to furnish all labor and materials for approximately $1.9 million; that Quiller did so and was paid the contract price; that it ordered all materials; and that it bore the risk of loss for materials at the job site until they became a part of the houses. It also points out that Quiller received payments under its contract for materials and that it treated these payments as gross receipts on its books and tax returns. The state also asserts that "Addendum No. 6" was not followed. From this, the state concludes that Quiller was not the Tribe's agent.

■ The state's position is too technical and restrictive. While it is true that a certain laxity prevailed with regard to complete observance of all the purchasing requirements provided for under Item 86 of "Addendum No. 6,"[19] many of them were followed. It is a fact that the Tribe was billed for all materials and that it paid all such bills. The fact that Quiller drew the money for this from the bank and paid it over to the Tribe before the bills were paid does not change this. Further, the two documents must be considered together, for Quiller was bound by both with regard to its participation in the project. The fact that the word "agent" was not used in either contract or by Quiller when it informed suppliers that the Tribe was to be billed for all materials is not important, if, in fact, an agency did exist. Where, as here, the contractor had the authority to order materials and to pledge the credit of the Tribe for the price of such materials, the Tribe was the disclosed purchaser, with

---

specification sections for section and resulting contract under which purchasing or installation, or both, occur. Delivery costs are included in the specifications with furnishing (purchasing). Receipt, storage at the site and protection is included with installation.
[List of materials omitted.]

**16.** *N.M.Stat.Ann. §§ 72–16A–3 F, K* (Repl.1974) (Supp.1975).

**17.** *N.M.Stat.Ann. § 72–16A–3 K* (Repl.1974) (Supp.1975).

**18.** *N.M.Stat.Ann. § 72–16A–14.9* (Repl.1974) (Supp.1975).

**19.** *See* p. 1069 and note 15 *supra.*

no liability for the price accruing to the contractor. *Kern-Limerick, Inc. et al. v. Scurlock*, 347 U.S. 110, 74 S.Ct. 403, 98 L.Ed.2d 546 (1954).

Finally, it should be noted that the state's position overlooks the totality of the circumstances surrounding the housing project. The various leases, the contracts, and the Housing Authority were designed to qualify under federal law for federal monies. It would be closing one's eyes to reality to ignore this. The houses were being built for the Tribe as *de jure* housing authority and as *de facto* owner. Once the project was financed and underway, OGO was nothing more, as OGO's president put it in his deposition, than "an interested watcher." Quiller was actually working for the Tribe and responsible to it. Quiller personnel knew that the Tribe intended that the company be the Tribe's agent for the purchase of materials. That the Tribe's motive for making Quiller its agent was to avoid the state's gross receipts tax is irrelevant. *See* 347 U.S. at 122, 74 S.Ct. 403.

■ Accordingly, no state gross receipts tax may validly be imposed on Quiller Construction Company for the purchase of materials used in the Mescalero Reservation housing project. As concluded below, it is taxable for monies received in connection with its services on the project.

### III.

The last question requiring resolution is whether the contractors who worked on the Inn of the Mountain Gods resort complex and the campground are subject to assessment[20] pursuant to the state's gross receipts tax. It has been agreed that the legal and factual issues raised in the assessments against the two out-of-state contractors, Western Landscape and Ramey, are identical to those raised with regard to the remaining out-of-state contractors and that the legal and factual issues raised in the assessment against the New Mexico firm, Burn Construction, are identical to those

involved in the assessments against the remaining in-state contractors. These three contractors worked on the Inn of the Mountain Gods resort complex. It has further been agreed that the Court's decision regarding the three contractors named above shall be deemed controlling and shall be res judicata and collateral estoppel for all parties and the contractors named in the complaint and in the stipulation entered into between the parties.

The resort complex built by these contractors on the Mescalero Reservation consists of a hotel, lake, golf course, and tennis facilities. It was built to generate income for the Tribe that would offset the decline in income from lumbering enterprises. So far, the complex has cost at least $20,000,-000.00, and another three or four million dollars is currently being spent for additional facilities. The project has been funded primarily by the Economic Development Administration [hereinafter E.D.A.] of the United States Department of Commerce. One loan of $6,000,000.00 was obtained from the Bank of New Mexico. Ninety percent of this loan is guaranteed by the Secretary of the Interior pursuant to the Indian Financing Act of 1974.[21] The remaining ten percent is guaranteed by the Tribe through the assignment to the bank of a $600,000.00 certificate of deposit.

Much of the state's evidence in this case has been submitted to prove that the Tribe's financial participation in the funding has amounted to practically nothing. Presumably, the state believes this fact supports its argument that the contractors are taxable. However, the source of the funds for the project has nothing to do with the issue.

The Tribe had not budgeted such taxes as a cost in its proposal to the E.D.A. for funds to build the complex, although E.D.A. does permit inclusion of the cost of passed-on state taxes in a grant for a project. After the initial bids for various aspects of the

---

**20.** It has been stipulated that the precise amounts of assessment are not an issue in the action.

**21.** *25 U.S.C.A. § 1451 et seq.*

complex were received, the Tribe told the contractors that the four percent gross receipts tax would not be due to the state and instructed them to submit alternative bids omitting such costs. The Tribe found it necessary to enter into an indemnification agreement with each contractor, agreeing to reimburse each for any such tax that might be determined to be due the state. If the taxes in question are found to be due, the amount of money owed the state is substantial, and the cost is imposed upon the Tribe by virtue of its indemnification agreements with the contractors.

This Court[22] and the courts of New Mexico[23] have heretofore held that the New Mexico gross receipts tax is a tax upon the seller. It is levied on the privilege of engaging in certain activities in New Mexico,[24] including construction activities.[25] Construction services include all tangible personal property that becomes an ingredient or component of a construction project.[26] The taxes due are an obligation only of the person engaging in business in the state.[27] The deduction allowed for sales of tangible personal property to Indian tribal governments for use on the reservation[28] does not apply. This provision does not reflect an intent to exempt construction services and the tangible personal property used to perform such services when the work is performed for an Indian tribe on its reservation by a non-Indian contractor, coming onto the reservation for the purposes of rendering construction services. Under the state's tax act, the contractors involved in the construction of the resort complex are subject to a tax on the gross receipts they received for performing construction services. The legal incidence of the tax falls upon them and not upon the Tribe or Tribal property. The state is imposing the tax solely on non-Indians who have performed services for the Tribe.[29] The umbrella of immunity from state taxation covering reservation land and income earned on the reservation by a reservation Indian is not wide enough to shield them from its imposition.

There is no question that the imposition of the tax will have an economic effect upon the Tribe. Such taxes normally are "passed on" to the purchaser. Here, in addition, the Tribe has contracted to indemnify the construction companies, but this contractual arrangement has nothing to do with whether the state can levy the tax upon the contractors. The effect is to reduce monies the Tribe could spend well on other things, but this does not make the tax anything more than an indirect burden on the Tribe. *Thomas v. Gay*, 169 U.S. 264, 18

22. *United States v. State of New Mexico et al.*, No. 75–425–B (D.N.M. July 1, 1976).

23. *First National Bank of Santa Fe v. Commissioner of Revenue*, 80 N.M. 699, 460 P.2d 64 (N.M.Ct.App.1969); *Bell Telephone Laboratories v. Bureau of Revenue*, 78 N.M. 78, 428 P.2d 617 (N.M.1966).

24. *N.M.Stat.Ann. § 72–16A–2* (Repl.1974) (Supp.1975).

25. *N.M.Stat.Ann. § 72–16A–3 K* (Repl.1974) (Supp.1975).

26. *Ibid.*

27. *N.M.Stat.Ann. § 72–16A–4, 5, 6* (Repl.1974) (Supp.1975).

28. *N.M.Stat.Ann. § 72–16A–14.9* (Repl.1974) (Supp.1975).

29. When the Tribe attempted to intervene in the state administrative hearings involving the assessment against one of its contractors, its motion to intervene was denied by the Commissioner of the Bureau of Revenue. Pursuant to *N.M.Stat.Ann. § 72–13–19* (Repl.1974) (Supp.1975), the Tribe appealed to the state court of appeals. The Court found that the Tribe, liable for the taxes only by virtue of its contract of indemnity, was not a taxpayer, i. e., one liable for payment of a tax or one who had been assessed, *N.M.Stat.Ann. § 72–13–15(O)* (Repl.1974) (Supp.1975), and dismissed the appeal. *Mescalero Apache Tribe v. Bureau of Revenue*, 88 N.M. 525, 543 P.2d 493 (N.M.Ct. App.1975).

The Tribe claims that the refusal to allow it to intervene in the state administrative hearings denied it and its contractors due process of law. However, it is concluded that the state court of appeals properly decided the issue against the Tribe. It is not the taxpayer and is not entitled to intervene solely because it has agreed to indemnify contractors for taxes that have been assessed against them.

S.Ct. 340, 42 L.Ed. 740 (1898); *see Agua Caliente Band of Mission Indians v. County of Riverside*, 442 F.2d 1184 (9th Cir. 1971), *cert. denied* 405 U.S. 933, 92 S.Ct. 930, 30 L.Ed.2d 809 (1972). It does not rise to the level of state infringement on the right of reservation Indians to make their own laws and be ruled by them. *See Williams v. Lee*, 358 U.S. 217, 79 S.Ct. 269, 3 L.Ed.2d 251 (1959).

■ Nor does the enactment of gross receipts tax and licensing ordinances by the tribal council make improper the imposition upon the contractors of the state's gross receipts tax. It does not interfere with tribal self-government simply because the tribe and another entity may have the power to impose a tax in the same area. *Fort Mojave Tribe v. County of San Bernardino*, 543 F.2d 1253 (9th Cir. 1976), *cert. denied* 430 U.S. 938, 97 S.Ct. 1687, 52 L.Ed.2d 377 (1977). While it may be true that the Tribe has the power to grant the privilege of engaging in business on the reservation, it is also true that the state has the power to tax business conducted in the state. The Mescalero Reservation is not located by itself on another planet. It is situated in New Mexico, and at the very least, the contractors were accorded benefits by and protection from the state as they went to and from the reservation.

Alternatively to its assertion that the state's gross receipts tax interferes with tribal self-government, the Tribe argues that there is governing federal legislation, leaving no room for the state to impose its tax in the present circumstances.

■ In this connection, there is no merit in its contention that its gross receipts tax and licensing ordinances, as approved by the Secretary of the Interior, amount to federal pre-emption. The Tribe is organized pursuant to the Indian Reorganization Act,[30] and its legislative actions are subject to review by the Secretary. However, his actions in approving taxing and licensing ordinances do not amount to federal pre-emption and thus oust state jurisdiction to levy its tax. *See Fort Mojave Tribe v. County of San Bernardino*, 543 F.2d at 1255–56.

■ Nor does the Indian Reorganization Act otherwise support the Tribe's pre-emption theory. That legislation was passed to encourage Indian development, but it did not expand Indian tax immunity to include the situation where a tax levied against someone else imposes only an economic burden on the Tribe. *See Mescalero Apache Tribe v. Jones*, 411 U.S. 145, 153–54 n. 9, 156 n. 12, 93 S.Ct. 1267, 36 L.Ed.2d 114 (1973); *Fort Mojave Tribe v. County of San Bernardino*, 543 F.2d at 1256. The Tribe's reliance on the New Mexico Enabling Act [31] is equally misplaced, for the tax in issue here is neither a tax upon Indian lands nor a use tax upon tangible personal property permanently attached to the land.

As indicated previously, the Indian Trader's licensing provisions, *25 U.S.C.A. §§ 261–64*, do not pre-empt the field under the facts and circumstances of this case, and the Tribe's further claim that the Buck Act [32] supports its position is not tenable. Section 109 of that act was only intended to preserve the immunity from state income tax of the income of reservation Indians earning their income on the reservation by excepting them from coverage under the Act. *McClanahan v. Arizona Tax Comm'n*, 411 U.S. 164, 177–78, 93 S.Ct. 1257, 36 L.Ed.2d 129 (1973); *Warren Trading Post Co. v. Arizona Tax Comm'n*, 380 U.S. at 691 n. 18, 85 S.Ct. 1242. Further, the failure of the state to assume jurisdiction over civil causes of action between Indians or to which Indians are parties which arise in Indian country situated in the state [33] has no relevance to the instant action.

■ The Tribe properly contends that its treaty with the United States precludes the extension of state tax laws to

---

**30.** *25 U.S.C.A. §§ 461 et seq.*

**31.** See p. 1066 and note 1 *supra.*

**32.** *4 U.S.C.A. §§ 105–110.*

**33.** Note 3 *supra.*

reservation Indians and lands. It improperly contends that it follows from its treaty that no state law has any force and effect on the Mescalero Reservation. If the Tribe is saying that the state cannot impose its gross receipts taxes upon the contractors' receipts from the activities they carried on within its reservation bounds simply because those activities were on the reservation, such is not the law. *See Mescalero Apache Tribe v. Jones*, 411 U.S. at 148, 93 S.Ct. 1267. While the provisions of its treaty are to be liberally construed in favor of the Tribe, *Carpenter v. Shaw*, 280 U.S. 363, 367, 50 S.Ct. 121, 74 L.Ed. 478 (1930), the treaty does not insulate from state jurisdiction everyone and everything coming in contact with the Tribe and occurring on its land.

Further, the commerce clause of the United States Constitution does not provide a basis to strike down the state's effort to tax the contractors. That effort could be invalidated only if it were to be found inconsistent with federal statutes and thus invalid under the supremacy clause, U.S.Const., art. VI, cl. 2. *Moe v. Salish & Kootenai Tribes*, 425 U.S. 463, 481 n. 17, 96 S.Ct. 1634, 48 L.Ed.2d 96 (1976).

The last challenge to the gross receipts tax is based upon the due process clause of the fourteenth amendment to the federal Constitution. The essence of the claim is that the state should not be allowed to impose a tax for which it gives little or nothing in return. The Tribe relies on *Warren Trading Post v. Arizona Tax Comm'n*, 380 U.S. at 690–91, 85 S.Ct. 1242, to support its position. While it is true that the *Warren Trading Post* reasoning cannot be restricted to cases involving licensed Indian traders, *McClanahan v. Arizona Tax Comm'n*, 411 U.S. at 170 n. 6, 93 S.Ct. 1257, it does not follow that the case can be so broadly construed as to oust the state's power to tax the non-Indian contractors involved in this action. As indicated before, they did receive benefits from the state. Since the tax is not a tax upon the Tribe or its members, its claim that it has received minimal benefits from the state is irrelevant to the issue of the validity of the tax. It is noted in passing, however, that there is evidence in the case of state benefits to Mescalero Apache Indians. In any event, it is settled that "taxes, otherwise lawful, are not invalidated by the allegation, or even the fact, that the resulting benefits are unequally shared." *Thomas v. Gay*, 169 U.S. at 278, 18 S.Ct. at 345.

### IV.

This case has presented one aspect of a problem that is with increasing frequency facing the courts. On one side are the Indians, subject to the plenary power of Congress. On the other side are the states, anxious to control what transpires within their borders and to raise revenues from whatever source they can. There is currently strong Indian resistance to any state effort to exert control over or to tax non-Indians doing business with the Indians. There is an equally strong effort by the states to fill with state laws any void existing by virtue of Congress's failure to enact governing legislation.[34] Between them stand the courts, hampered by Congressional inaction on the subject.

The whole area of state jurisdiction over non-Indians doing business with Indians on Indian lands deserves Congressional review and the enactment of definitive federal legislation. In their absence, the courts can only cope with each fact situation that arises within a framework of fragmentary legislation. Further, the scope of the problem is such that it does not lend itself to resolution by the process of piece-meal adjudication. Yet this is precisely what must happen in the absence of Congressional action, and it is done by judges who do not possess:

> "[T]he legislature's superior resources for fact gathering; its ability to act without

---

**34.** *See generally* M. Price, Law and the American Indian Ch. II (1973); Note, 2 N.M.L.R. 71 (1972); Comment, 2 N.M.L.R. 81 (1972).

awaiting an adventitious concatenation of the determined party, the right set of facts, the persuasive lawyer, and the perceptive court; its power to frame pragmatic rules departing from strict logic, and to fashion a broad new regime or to bring new facts within an existing one; its practice of changing law solely for the future in contrast to the general judicial reluctance so to proceed; and, finally, the greater assurance that a legislative solution is not likely to run counter to the popular will—all these give the legislature a position of decided advantage, if only it will use it." [35]

A judgment will be entered herein, granting declaratory relief as to the claim that Quiller Construction Company is exempt from New Mexico's gross receipts tax and finding for the state on all other issues in the action.

### JUDGMENT

This action having come on for trial to the Court, and the Court having filed herein its Memorandum Opinion containing its findings of fact and conclusions of law; Now, Therefore,

IT IS DECLARED AND ADJUDGED that the State of New Mexico through its Bureau of Revenue and the Commissioner of Revenue may not impose upon Quiller Construction Company, Inc., its gross receipts tax for the purchase price of materials used in connection with a tribal housing project on the Mescalero Apache Reservation, and that the state may impose its gross receipts tax on Quiller Construction Company for monies it received in payment for its services in connection with the housing project.

IT IS FURTHER DECLARED AND ADJUDGED that the defendant Secretary of Interior and his subordinates, in authorizing and granting Indian traders' licenses to the corporations named herein acted beyond the scope and intent of 25 *U.S.C.A.* §§ 261–64 *and* 25 *C.F.R.* §§ 251.1–26.

IT IS FURTHER DECLARED AND ADJUDGED that the State of New Mexico may impose its gross receipts tax upon Burn Construction Co., Inc., Boone Electric Co., Inc., Lew Hammer, Inc., Howell Construction, Inc., Intermountain Specialty Construction, Inc., Western Landscape Construction, Inc., and Ramey Construction Co., Inc., for their work on the Inn of the Mountain Gods resort complex and the recreation and campground area.

IT IS THE FURTHER ORDER OF THE COURT that each side bear its own costs of action.

---

**35.** H. Friendly, Benchmarks 46 (1967).