ENFORCED.

MESCALERO APACHE TRIBE, Plaintiff-Appellant and Cross-Appellee,

v.

Fred L. O'CHESKEY, as Commissioner of Revenue of and for the State of New Mexico and his Successors in Office; the Bureau of Revenue of the State of New Mexico; and the State of New Mexico, Defendants-Appellees and Cross-Appellants.

Nos. 77–2102, 77–2103.

United States Court of Appeals, Tenth Circuit.

Argued Sept. 12, 1979.

Decided June 5, 1980.

Rehearing Denied Aug. 25, 1980.

Logan, Circuit Judge, filed concurring opinion.

Doyle, Circuit Judge, filed dissenting opinion in which McKay, Circuit Judge, joined.

McKay, Circuit Judge, filed dissenting opinion in which Doyle, Circuit Judge, joined.

McKay, Circuit Judge, dissented from denial of rehearing and filed statement.

Kim Jerome Gottschalk and Norman D. Bloom, Jr. of Fettinger & Bloom, Alamogordo, N. M. (George E. Fettinger of Fettinger & Bloom, Alamogordo, N. M., on the brief), for plaintiff-appellant and cross-appellee.

Jan Unna, Sp. Asst. Atty. Gen., Santa Fe, N. M. (Toney Anaya, Atty. Gen. of New Mexico, and Daniel H. Friedman, Sp. Asst. Atty. Gen., Santa Fe, N. M., on the brief), for defendant-appellee and cross-appellant State of New Mexico.

Severson, Werson, Berke & Melchior, San Francisco, Cal., and George J. Ahlmann of Ahlmann & Sigler, Navajo, N. M., filed brief, for amicus curiae Navajo Forest Products Industries.

James W. Moorman, Asst. Atty. Gen., Washington, D. C., Victor R. Ortega, U. S. Atty., Ruth C. Streeter, Asst. U. S. Atty., Albuquerque, N. M., and Carl Strass and Robert W. Frantz, Dept. of Justice, Washington, D. C., filed brief, for amicus curiae United States.

Before SETH, Chief Judge, and HOLLOWAY, McWILLIAMS, BARRETT, DOYLE, McKAY and LOGAN, Circuit Judges.

SETH, Chief Judge.

The State of New Mexico sought to impose its gross receipts tax on the several contractors who had done construction work for the Mescalero Apache Tribe on a resort complex and other projects within the boundaries of the State of New Mexico. The work was performed for the Mescaleros and on reservation lands. The trial court held that the tax was imposed on the contractors and they were liable for it to the State of New Mexico. The trial court held that the Tribe had purchased materials on the housing job constructed by Quiller Construction Company, Inc. and these purchases were not within the gross receipts tax by reason of a specific exemption.

The basic issue on this appeal is the application of the New Mexico gross receipts tax. The state act makes the materials used and work of a building contractor taxable as services. It is levied on the contractor. N.M.Stat.Ann. §§ 7–9–3 F, K *et seq.* (1978). The contractors here concerned were individuals or entities engaged in the general construction business.

The state tax is on the privilege of engaging in the business of a building contractor in the state. The contractors were engaged in such a business, and built and supervised the building of the resort and housing. There is nothing in the record to show that "all their activities" were on reservation lands and the indications are otherwise. The construction was, of course, done on Indian land and this is all the record shows. The New Mexico tax has been considered by the New Mexico courts to be a privilege tax. *Mescalero Apache Tribe v. Bureau of Revenue*, 88 N.M. 525, 543 P.2d 493; *First Nat. Bank of Santa Fe v. Commissioner of Revenue*, 80 N.M. 699, 460 P.2d 64; *Bell Telephone Laboratories v. Bureau of Revenue*, 78 N.M. 78, 428 P.2d 617. The incidence of the tax has been so held to be on the seller—the contractor—as the one providing the services.

The holding of a state court as to the incidence of a tax of its state is generally determinative on the consideration of the issue by the federal courts. *See Kern-Lim-*

*erick, Inc. v. Scurlock*, 347 U.S. 110, 74 S.Ct. 403, 98 L.Ed. 546, and *Federal Land Bank v. Bismarck Lumber Co.*, 314 U.S. 95, 62 S.Ct. 1, 86 L.Ed. 65.

■ This court considered the same tax in *United States v. State of N. M.*, 581 F.2d 803 (10th Cir.), and decided that the sovereignty of the United States did not prevent the imposition of this tax on a contractor providing services to the federal government on federal lands. We there also necessarily considered the incidence of this tax.

"Thus, the decisive issue in this case is whether the legal incidence of the challenged New Mexico taxes falls on the United States, regardless of where the economic burden ultimately rests. . .

. . . . . .

"The Act specifically makes the gross receipts tax applicable to the doing of business in New Mexico without reference to whether that business is with the United States and, with uniformly applied exceptions, assesses the tax upon anyone receiving compensation. There is no evidence that the tax interferes with the performance of federal functions. The tax is not directly imposed on the United States and, although the contractors pass the tax on to the United States they are not required by the Act to do so."

The incidence of this tax cannot be different here just because Indians are involved. The tax is the same, the incidence remains the same, and it is clearly on the contractor. The Indians here are in no different a position than was the federal government in *United States v. State of N. M.*, 581 F.2d 803 (10th Cir.).

At the outset it might be well to state what this case is *not* about. It is not about the power to tax Indian lands, nor about taxation of income from Indian lands, nor the income of Indians on such lands. These issues have long been settled, and the state has disclaimed that it has any such rights. The case is also not about Indian lands generally. Instead, we are only concerned with a state privilege tax on a contractor engaged in business in New Mexico with the measure of such tax to include construction of the lands set apart for the Mescaleros. The case is also not about an indemnity agreement whereby the Mescaleros undertook to indemnify the contractors for the tax.

The tax here concerned could have been included in the funding from the E.D.A. No reason appears why this was not done. The trial court of this stated:

"The Tribe had not budgeted such taxes as a cost in its proposal to the E.D.A. for funds to build the complex, although E.D.A. does permit inclusion of the cost of passed-on state taxes in a grant for a project. After the initial bids for various aspects of the complex were received, the Tribe told the contractors that the four percent gross receipts tax would not be due to the state and instructed them to submit alternative bids omitting such costs. The Tribe found it necessary to enter into an indemnification agreement with each contractor, agreeing to reimburse each for any such tax that might be determined to be due the state. If the taxes in question are found to be due, the amount of money owed the state is substantial, and the cost is imposed upon the Tribe by virtue of its indemnification agreements with the contractors." *Mescalero Apache Tribe v. O'Cheskey*, 439 F.Supp. 1063, at 1071–72 (D.N.M.).

The only reason this point is mentioned is because the way it was handled by the Tribe makes it *appear* that the incidence of the tax was on the Tribe when it was not. The point does not appear to be otherwise significant. The asserted direct "burden" on the Tribe was thus by its own election to indemnify the contractors. The result in this case should not be determined or influenced in any way by such a contractual arrangement.

It is apparent that in doing business in New Mexico the contractors here benefitted from the state laws and the state governmental activities. The trial court so found and also found the Mescaleros also so benefitted. As the trial court stated, the Indian

lands concerned were obviously within New Mexico. The gross receipts tax on contractors, and all others, obviously is a cost of doing business as are the employment security taxes, social security taxes, income taxes, and all the overhead that goes into the jobs, and must be recovered from the work charges. The tax nevertheless is on the seller. An indirect burden obviously is initially on the one for whom the services are performed—thus on the Tribe or the Government. However, it is equally apparent that this indirect burden is again passed on to the users of the resort and again by them. The tax becomes dispersed. There is no way of telling where the ultimate economic burden falls. This is the reason why the initial incidence of the tax must be the determinative factor. It is the only significant matter for our consideration.

The state has extensive powers over Indians like any other persons and on reservations which may be exercised if it chooses to do so. Thus the Supreme Court in *Kake Village v. Egan*, 369 U.S. 60, 82 S.Ct. 562, 7 L.Ed.2d 573 (a non-reservation group), said after referring to the cases involving the authority of the states:

> "These decisions indicate that even on reservations state laws may be applied to Indians unless such application would interfere with reservation self-government or impair a right granted or reserved by federal law."

*See generally*, Craig, 9 N.M.L.Rev. 221. *Worcester v. Georgia*, 6 Pet. 515, 8 L.Ed. 483, is discussed, and it is pointed out that other decisions have reduced its scope. In the *Kake* opinion the Court points out as to *Worcester*:

> "By 1880 the Court no longer viewed reservations as distinct nations. On the contrary, it was said that a reservation was in many cases a part of the surrounding State or Territory, and subject to its jurisdiction except as forbidden by federal law." (Citations omitted.)

The Court then states how "the influence of state law increased rather than decreased." This referred to the policy after 1934. The Court in the *Kake* opinion again mentions how Justice Marshall's decision in *Worcester*, that the state cannot penetrate the reservation boundaries, "has yielded to closer analysis when confronted, in the course of subsequent developments, with diverse concrete situations." There was *no reservation* involved in *Kake*, but it included activities provided by Treaty.

Again, the Supreme Court said in *Mescalero Apache Tribe v. Jones*, 411 U.S. 145, 148, 93 S.Ct. 1267, 1270, 36 L.Ed.2d 114.

> "The upshot has been the repeated statements of this Court to the effect that, even on reservations, state laws may be applied unless such application would interfere with reservation self-government or would impair a right granted or reserved by federal law."

This clearly states again the position of, or application of state laws on the Mescalero Reservation. This leaves no room for any doctrine of preemption. The relationship of the parties is defined. The parties are defined, and are only the state and Congress.

The fact that some of the services, and most of them, were performed on Indian land is thus not a factor to be considered under the above decisions. The tax is on the contractor and on the privilege of doing business in New Mexico. It is also apparent, as the trial court points out, there is at least an initial economic impact on the Tribe since the contractor can pass the tax along. This is the initial indirect burden, and in the normal course of events would have been absorbed in the E.D.A. funding or grant. The Tribe chose instead to accept the "indirect burden" and whether the Tribe so absorbs it until it in turn passes it on to the users of the resort, or whether the Government does, is of no consequence. This is into the morass of indirect burdens.

*Moe v. Salish & Kootenai Tribes*, 425 U.S. 463, 96 S.Ct. 1634, 48 L.Ed.2d 96, is significant in that it concerned, *in part*, a tax on the non-Indian buyer of cigarettes on the reservation. The Court there used the incidence of the tax, which was on the buyer, to validate it as to such sales. There, of course, was no indirect burden argument,

but the state tax on a transaction on the reservation was upheld. The incidence of such tax was the factor considered. Here we have the tax incidence also outside and also on a non-Indian. The only difference is the indirect burden argument which is not persuasive. *See also* our *Ute Indian Tribe v. State Tax Comm'n.*, 574 F.2d 1007 (10th Cir.).

In *Moe v. Salish & Kootenai Tribes*, 425 U.S. 463, 96 S.Ct. 1634, 48 L.Ed.2d 96, the Court referred to *McClanahan v. Arizona State Tax Comm'n.*, 411 U.S. 164, 93 S.Ct. 1257, 36 L.Ed.2d 129, and *Mescalero Apache Tribe v. Jones*, 411 U.S. 145, 93 S.Ct. 1267, 36 L.Ed.2d 114. In the footnote on page 481 of 425 U.S. (page 1645 of 96 S.Ct.) the Court said in part:

> "It is thus clear that the basis for the invalidity of these taxing measures, which we have found to be inconsistent with existing federal statutes, is the Supremacy Clause, U.S.Const., Art. VI, cl. 2, and not any automatic exemptions 'as a matter of constitutional law' either under the Commerce Clause or the intergovernmental-immunity doctrine . . . ."

In *Moe* the Court further observed that the tax in *Warren Trading Post v. Tax Comm'n.*, 380 U.S. 685, 85 S.Ct. 1242, 14 L.Ed.2d 165, was imposed directly on the seller. There was no claim in *Warren* that the tax could be imposed on reservation sales to non-Indians. The position of the trader in *Warren* as licensed and regulated was obviously a very significant factor. The Court in *McClanahan v. Arizona State Tax Comm'n.*, 411 U.S. 164, 93 S.Ct. 1257, 36 L.Ed.2d 129, explains that part of the reason was the policy of Congress as to the Navajo Reservation and tribal self-determination thereon. *Warren* concerned an entity long regulated by Congress. It concerned only income from sales to Indians (as presented to the Court), and was on a permanent enterprise on the reservation. The licensing in the case before us was of course a pretext or a fiction and in no way was comparable to the licensing in *Warren*. *See* the trial court finding of fact as to the licensing.

The Treaty with the Mescaleros does not assist us in arriving at a solution. The Mescaleros came under the sovereignty of the United States by the Treaty of Guadalupe Hidalgo with Mexico. The sovereignty over the Mescaleros exercised by Spain in the sixteenth and seventeenth centuries was actual as was, of course, that exercised by the government of Mexico. The sovereignty was transferred over all the inhabitants of what became New Mexico from Spain to Mexico to the United States by treaties. The record contains a "Treaty with the Apaches." This was an agreement entered into with *some* Apaches, including some Mescaleros, and was ratified by Congress. It is binding on the United States but there appears to have been, at least at one time, some doubt as to whether it was binding on any Apaches except those who signed it. It is apparent from the events which followed it that the Apaches did not agree among themselves as to who was bound or which bands were bound. But be that as it may we must assume for these purposes that the Treaty was valid. It was a treaty of "peace and friendship." As this was all it purported to be, it established no rights generally for either party nor any rights in land. *See Choate v. Trapp*, 224 U.S. 665, 32 S.Ct. 565, 56 L.Ed. 941. The Mescaleros were then under the complete sovereignty of the United States. The Treaty thus does not appear to be of any significance as to our problem.

Thus we are left with the non-discriminatory state gross receipts or privilege tax the incidence of which is on the building contractors. The contractors benefitted from state governmental activities and services during the time they performed the services taxed. It is obvious that the indirect burden is on the one for whom the services were performed as recognized in *United States v. State of N. M.*, 581 F.2d 803 (10th Cir.). This indirect burden was not enough there, and it is not enough here. The only measure here is whether this indirect burden constitutes an interference with the internal affairs of the Mescaleros. It is a non-discriminatory tax levied on all contractors. It is something everybody pays.

The indirect burden is, as we have said above, something to be again passed on as the Tribe engages in its resort and other business. It is the indirect consequence of taxes *on others* which reaches the Mescaleros as do all other costs, levies and taxes on persons with whom they do business. If this is an interference, all such taxes and levies on those doing business with them, the suppliers of such persons, the wholesalers and the manufacturers are likewise an interference. All these taxes affect the *money* of the Mescaleros the same way, and the money available for other purposes.

We find no merit to the several other contentions and issues advanced by the appellants.

The judgment of the trial court is AFFIRMED.

LOGAN, Circuit Judge, concurring:

I join in Chief Judge Seth's opinion, but write separately to point out certain controlling distinctions between this case and *Merrion v. Jicarilla Apache Tribe*, 617 F.2d 537 (10th Cir., 1980), treating an Indian tribe's power to tax.

In my view, at issue in this case is a question we did not address in *Merrion* —"whether the *state's* tax interferes with the federal interest in regulating the affairs of the Indians," *id.* at 546 (emphasis in original), in violation of the Indian Commerce Clause, art. I, § 8, cl. 3, of the United States Constitution. To answer this question it is necessary to consider the nature of the tax, its effect on Indian self-government, and the nature and extent of federal involvement in the Tribe's business venture. The other and substantially similar question in this case is whether the state's tax is preempted by federal regulation in the area and hence invalid under the Supremacy Clause. *See Moe v. Confederated Salish & Kootenai Tribe*, 425 U.S. 463, 481 n.17, 96 S.Ct. 1634, 1645 n.17, 48 L.Ed.2d 96 (1976).

The gross receipts tax involved here has some income tax and some sales tax characteristics. As applied to money paid for performing services in New Mexico, it is not unlike a state income tax without the deductions usually allowed. Generally speaking, the validity of such a tax in the context here depends upon its "legal incidence"; who bears the ultimate economic burden has no relevance. *Gurley v. Rhoden*, 421 U.S. 200, 207, 95 S.Ct. 1605, 1610, 44 L.Ed.2d 110 (1975). Is this gross receipts tax similar to a tax on Indian personal property located within a reservation, prohibited by *Moe v. Confederated Salish & Kootenai Tribe*, 425 U.S. 463, 480, 96 S.Ct. 1634, 1644, 48 L.Ed.2d 96 (1976), or is its incidence upon non-Indians similar to the cigarette tax upheld in that decision?

The determinations of the state courts on legal incidence of state taxes are given great weight, and if consistent with a reasonable interpretation are conclusive. *American Oil Co. v. Neill*, 380 U.S. 451, 455–56, 85 S.Ct. 1130, 1133–1134, 14 L.Ed.2d 1 (1965). New Mexico has construed gross receipts tax as placing the legal incidence upon the person in the position of the contractor here. *First Nat'l Bank v. Commissioner of Revenue*, 80 N.M. 699, 705, 460 P.2d 64, 70 (Ct.App.), *cert. denied*, 80 N.M. 707, 460 P.2d 72 (1969), *appeal dismissed*, 397 U.S. 661, 90 S.Ct. 1407, 25 L.Ed.2d 643 (1970). Considering the tax in the context of contractors dealing with the United States government, this Court, after careful analysis, ruled that the incidence was upon the contractor and that New Mexico could collect the tax. *United States v. New Mexico*, 581 F.2d 803 (10th Cir. 1978).

The legal incidence, in some cases, may be determined by the contract between the parties. As recognized in *United States v. New Mexico, id.* at 808, the parties might have arranged to make the United States, rather than the contractor-builder, the purchaser of goods. Based upon the construction of the contract here that the contractors were made agents for the Tribe in the purchase of materials, I agree that the New Mexico use tax was properly held to be inapplicable in the instant case. But there are limitations on the ability to control the incidence. The gross receipts tax attaches to the payments received by the contractors for their services; the Tribe cannot be

made the provider of these personal services. Therefore, an agreement to reimburse the contractors if the New Mexico tax is levied does not shift the incidence of the gross receipts tax on payment for services away from the contractors.

Thus, under principles ordinarily applied the tax is valid. Is it nevertheless invalid because of its effect on Indian self-government? *McClanahan v. Arizona State Tax Comm'n*, 411 U.S. 164, 93 S.Ct. 1257, 36 L.Ed.2d 129 (1973), struck down a state income tax levied against "a reservation Indian whose entire income derives from reservation sources." *Id.* at 165, 93 S.Ct. at 1258. The Court there carefully noted it was not concerned "with exertions of state sovereignty over non-Indians who undertake activity on Indian reservations." *Id.* at 168, 93 S.Ct. at 1260. It distinguished the Indian sovereignty cases in discussion fairly applicable to this case:

> It must be remembered that cases applying the *Williams* [*v. Lee*, 358 U.S. 217, 79 S.Ct. 269, 3 L.Ed.2d 251 (1959)] test have dealt principally with situations involving non-Indians. See also *Organized Village of Kabe v. Egan*, 369 U.S. at 75–76, 82 S.Ct. 562, 7 L.Ed.2d 573. In these situations, both the tribe and the State could fairly claim an interest in asserting their respective jurisdictions. The *Williams* test was designed to resolve this conflict by providing that the State could protect its interest up to the point where tribal self government would be affected.

411 U.S. at 179, 93 S.Ct. at 1266.

As stated previously, the state's tax on the contractors' receipts for services is in essence an income tax without the usual deductions. We are familiar, of course, with the concept that the nation and a state may tax all of the income of residents from whatever source and wherever derived, and may tax income of nonresidents earned within the jurisdiction. Further, individuals and businesses may have the same earnings taxed by federal, state and local governmental entities.

If the tax at issue here may be said to be levied upon non-Indians, is nondiscriminatory, and does not preclude a possible similar tax by the Tribe on activities conducted on the reservation, I do not believe the Indians' right to self-government is impaired. These circumstances are present here. The direct burden of the tax is not upon the Tribe, but upon the non-Indian contractors. Business with the Indians is not singled out for special treatment; the tax applies to all transactions within New Mexico. Nothing in this case would seem to preclude the Tribe from exercising its legitimate taxing powers. *See Merrion v. Jicarilla Apache Tribe, supra.* The Tribe has apparently enacted its own gross receipts tax, but has not applied it to these transactions. That it did not impose the tax here is a reflection of its understanding that the contractors simply would have raised the amount of their bids by that amount. *See* Appellant's Brief at 26.

I turn now to the preemption or territorial argument discussed most fully in part II of Judge McKay's dissenting opinion, which is relevant to both the Commerce Clause and Supremacy Clause analyses. At first blush it seems significant that by the language of the treaty the Tribe submits itself "exclusively" to the jurisdiction of the United States, Treaty with the Apaches, July 1, 1852, 10 Stat. 979; and that the Enabling Act for New Mexico, 36 Stat. 557, 558–59 (1910), says the Tribe is to remain under the "absolute jurisdiction and control" of the United States. But the Supreme Court has construed this exclusivity narrowly. This New Mexico tax and the same tribe were involved in *Mescalero Apache Tribe v. Jones*, 411 U.S. 145, 93 S.Ct. 1267, 36 L.Ed.2d 114 (1973), which addressed the question whether the New Mexico tax could be levied against revenues earned by the tribe from operating a ski resort outside the reservation. En route to holding that the tax could be so applied, the Court discussed the intergovernmental immunity doctrine in the following language:

> The intergovernmental-immunity doctrine was once much in vogue in a variety of contexts and, with respect to Indian

affairs, was consistently held to bar a state tax on the lessees of, or the product or income from, restricted lands of tribes or individual Indians. The theory was that a federal instrumentality was involved and that the tax would interfere with the Government's realizing the maximum return for its wards. This approach did not survive; its rise and decline in Indian affairs is described and reflected in *Helvering v. Mountain Producers Corp.*, 303 U.S. 376, 58 S.Ct. 623, 82 L.Ed. 907 (1938); *Oklahoma Tax Comm'n v. United States*, 319 U.S. 598, 63 S.Ct. 1284, 87 L.Ed. 1612 (1943); and *Oklahoma Tax Comm'n v. Texas Co.*, 336 U.S. 342, 69 S.Ct. 561, 93 L.Ed. 721 (1949), where the Court cut to the bone the proposition that restricted Indian lands and the proceeds from them were—as a matter of constitutional law—automatically exempt from state taxation. Rather, the Court held that Congress has the power "to immunize these lessees from the taxes we think the Constitution permits Oklahoma to impose in the absence of such action" and that "[t]he question whether immunity shall be extended in situations like these is essentially legislative in character." *Oklahoma Tax Comm'n v. Texas Co., supra*, at 365–366, 69 S.Ct. 561.

Some of these contractors were New Mexico corporations. Since the state could tax income, and, I believe, gross receipts of the resident companies from any source the only question would seem to be whether the law was intended to be applied to gross receipts from activities upon the reservation. It seems clear New Mexico intended to go as far toward this end as possible. *See Prince v. Board of Education*, 88 N.M. 548, 543 P.2d 1176 (1975).

Some of the contractors doing work on the reservation are not residents of New Mexico. New Mexico would seem to have power to levy its gross receipts tax on them only if the services were performed in New Mexico. *See* N.M.Stat.Ann. § 7–9–3 F (1978). Is the reservation "in New Mexico" in the legal sense? Certainly the state seems to think so. *See Prince v. Board of*

*Education, supra.* While the Court in *Mescalero Apache Tribe v. Jones*, 411 U.S. 145, 93 S.Ct. 1267, 36 L.Ed.2d 114 (1973), recognizes the state may not apply its use tax to personal property permanently affixed to the Tribe's tax exempt land, it infers that in the absence of federal legislation, state taxation of non-Indians' activities on Indian lands is generally permissible. *Id.* at 150, 93 S.Ct. at 1721. *Moe v. Confederated Salish & Kootenai Tribes*, 425 U.S. 463, 96 S.Ct. 1634, 48 L.Ed.2d 96 (1976), upheld a Montana tax on sales of cigarettes to non-Indians on the reservation without reference to the purchasers' state of residence.

*Warren Trading Post Co. v. Arizona Tax Comm'n*, 380 U.S. 685, 85 S.Ct. 1242, 14 L.Ed.2d 165 (1965), struck down a state gross receipts tax levied against a federally licensed merchant doing a retail trading business on an Indian reservation. The case is distinguishable on its facts; the contractor's activities here are not subject to that licensing act and in *Warren Trading Post* there was specific federal regulation. The opinion does not treat the legal incidence issue. Although *Warren Trading Post* is somewhat sweeping in language, and lends support to a preemption decision favorable to the Tribe, I am convinced that recent opinions of the Supreme Court, some of which are cited above, indicate that application of the state gross receipts tax would be accommodated in the situation confronting us.

Finally, the extent of the federal government's role in this area, as a measure of federal interest in Indian affairs, is significant. Federal participation and interest in this particular business venture is extensive, but that alone is not enough to immunize these contractors from state taxation. *See Mescalero Apache Tribe v. Jones*, 411 U.S. 145, 151, 93 S.Ct. 1267, 1272, 36 L.Ed.2d 114 (1973) (federal government conducted the feasibility study, supplied the equipment and loaned the Tribe the construction money). Neither am I persuaded by the Tribe's argument that the federal policy of encouraging Indian economic development, *see, e. g.,* Indian Financing Act of 1974, 25

U.S.C. § 1451 *et seq.*, precludes state taxation here. Construction of the resort complex was financed primarily by the Economic Development Administration of the United States Department of Commerce, which permits inclusion of the cost of passed-on state taxes in a grant.

For these reasons I concur in the affirmance of the trial court's judgment.

WILLIAM E. DOYLE, Circuit Judge, dissenting in which McKAY, Circuit Judge, joins:

I respectfully dissent.

### INTRODUCTORY

The question in the case is whether New Mexico is authorized, under the Constitution and laws of the United States to impose a tax on the privilege of doing business measured by the gross receipts of contractors who performed work on the tribal lands, the actual burden of which was and had to be absorbed by the Tribe.

The majority upholds the tax saying that the "incidence" of it falls on the contractors. It is true that the tax is measured by the gross receipts of the contractors who were performing work for the Tribe—its construction of the Tribe's Inn of the Mountain Gods resort complex, a tribal housing project, and a recreation area and campground. All of these projects were located on the tribal property and although the contractors were non-Indians, they were acting for and on behalf of the Tribe. The Tribe issued traders' licenses to each of the contractors. Also, the Tribe undertook to indemnify the contractors for any gross receipts tax which they were required to pay. The sole attempt of the majority to justify ignoring the impact on the Tribe is found in its use of the term "incidence of the tax." The majority opinion repeats this several times.

The effort of the majority opinion and the opinion of the district court has been to distinguish between taxes which are on the Tribe directly and those which ultimately become the Tribe's burden. The latter, it is argued, are permissible, whereas the former

are not. Thus, it is the form of the tax which becomes the important factor. Whether the Tribe is the victim is unimportant so long as the tax is aimed at the contractor. Admittedly, though, it would not be valid if it were *directly* against the Tribe. So, then, if the Tribe were to act as its own contractor and if it had hired the contractors, architects and other agents, the tax in its present form could not be levied against the Tribe, and it would be questionable if levied against the contractors. All of this emphasizes that the structure of the majority opinion, like the New Mexico statute, is purely formal in that it ignores the fact that the *burden* comes to rest on the Tribe; that the cost to the Tribe will necessarily be increased if the contractors are required to pay the tax; that the program of the United States to develop tribal independence would be impeded. An approach which disregards the impact of the tax in favor of who is first in line cannot be upheld. It fails because it never asks the question whether tribal activity is, in truth, the object of the tax and whether its burden falls on the Tribe or on the United States, whereby the broader inquiry would yield the answer that the Tribe is indeed the ultimate victim. The test used by the majority that the "incidence" of the tax falls on the contractors is vague and meaningless. To approve it would allow New Mexico to insert its foot in the door and make its entry into the Indian revenue scene. New Mexico would be allowed to exact revenue in the complete absence of evidence showing governmental support to either the Tribe or the contractors. Strictly speaking, the business which was being taxed was being carried on in the Tribal areas which are not subject to state regulation.

We will attempt to show that the subject tax is contrary to historical documents, the Supreme Court decisions, and the other recognized criteria.

### I.

### HISTORICAL BACKGROUND

The present conflict between state and Tribe is not new. It has been present in the

courts and in the Congress from almost the early 1800's. One of the original decisions was rendered by the Supreme Court in *Worcester v. Georgia,* 31 U.S. (6 Pet.) 515, 8 L.Ed. 483 (1832). Chief Justice Marshall, in there writing for the Court, described the relationship between the state and an Indian tribe. The plaintiff in error was indicted under Georgia law for residing in that part of the Cherokee nation attached by the laws of the State of Georgia to the County of Gwinnett without a license or permit from the state. The effort on the part of the State of Georgia to exercise its authority on the Cherokee Reservation was rejected by the Supreme Court. The opinion declared that the Cherokee nation was a distinct community occupying its own territory, with boundaries accurately described, in which the laws of Georgia "can have no force, and which the citizens of Georgia have no right to enter, but with the assent of the Cherokees themselves, or in conformity with treaties, and the acts of congress. The whole intercourse between the United States and this nation is, by our constitution and laws, vested in the government of the United States. The act * * * is, consequently void, and the judgment a nullity." 31 U.S. (6 Pet.) at 561. The Court conceded that Georgia might regulate the Cherokee nation outside the latter's territory, but within the Reservation, it was said, the Georgia laws were "repugnant to the constitution, laws and treaties of the United States. They interfere forcibly with the relations established between the United States and the Cherokee nation, the regulation of which, according to the settled principles of our constitution, are committed exclusively to the government of the union. They are in direct hostility with treaties, repeated in a succession of years, which mark out the boundary that separates the Cherokee country from Georgia * * * " 31 U.S. (6 Pet.) at 561–562. The notion that an Indian tribe enjoyed sovereignty equal to that of the state, which idea was expressed in *Worcester,* did not continue to be accepted.

Less expansive language has been used in subsequent cases, a fact which was noted by the Supreme Court in *Mescalero Apache Tribe v. Jones,* 411 U.S. 145, 93 S.Ct. 1267, 36 L.Ed.2d 114 (1973). The Court (in *Jones*) also called attention to the fact that although the state may have some undefined police power in connection with Indian reservations, that it does *not* have the power to levy taxes on Indian reservation lands or Indian income from activities carried on within the boundaries of the reservation.

The part of the opinion in *Jones* which commented on the expressions in *Worcester v. Georgia, supra,* follows:

The conceptual clarity of Mr. Chief Justice Marshall's view in *Worcester v. Georgia,* 6 Pet. 515, 556–561, 8 L.Ed. 483 (1832), has given way to more individualized treatment of particular treaties and specific federal statutes, including statehood enabling legislation, as they, taken together, affect the respective rights of States, Indians, and the Federal Government. See *McClanahan v. Arizona State Tax Comm'n,* 411 U.S. 164, 93 S.Ct. 1257, 36 L.Ed.2d 139; *Organized Village of Kake v. Egan,* 369 U.S. 60, 71–73, 82 S.Ct. 562, 7 L.Ed.2d 573 (1962). The upshot has been the repeated statements of this Court to the effect that, even on reservations, state laws may be applied unless such application would interfere with reservation self-government or would impair a right granted or reserved by federal law. *Organized Village of Kake, supra,* at 75, 82 S.Ct. 562; *Williams v. Lee,* 358 U.S. 217, 79 S.Ct. 269, 3 L.Ed.2d 251 (1959); *New York ex rel. Ray v. Martin,* 326 U.S. 496, 499, 66 S.Ct. 307, 90 L.Ed. 261 (1946); *Draper v. United States,* 164 U.S. 240, 17 S.Ct. 107, 41 L.Ed. 419 (1896). Even so, in the special area of state taxation, absent cession of jurisdiction or other federal statutes permitting it, there has been no satisfactory authority for taxing Indian reservation lands or Indian income from activities carried on within the boundaries of the reservation, and *McClanahan v. Arizona State Tax Comm'n, supra,* lays to rest any doubt in this respect by holding that such taxation

is not permissible absent congressional consent.

411 U.S. at 148, 93 S.Ct. at 148. The above shows recognition by the Court that the broad concept enunciated by Chief Justice Marshall in *Worcester* has eroded as applied to matters other than taxation. It has, in the area of state taxation, continued to be viable absent expressed cession of jurisdiction or Congressional consent. So, this present effort of New Mexico is on its face suspect and calls for close scrutiny.

*Jones* also teaches that the applicable treaty and special federal statutes, together with state enabling legislation, must be considered.

Article 1 of the Treaty with the Apaches (July 1, 1852), states:

> Article 1. Said nation or tribe of Indians through their authorized Chiefs aforesaid do hereby acknowledge and declare that they are lawfully and exclusively under the laws, jurisdiction, and government of the United States of America and to its power and authority they do hereby submit.

Article 11 brings out the exclusiveness of the United State's authority over the tribe and its members. It provides:

> Article 11. This Treaty shall be binding upon the contracting parties from and after the signing of the same, subject only to such modifications and amendments as may be adopted by the government of the United States, and, finally, this treaty is to receive a liberal construction, at all times and in all places, to the end that the said Apache Indians shall not be held responsible for the conduct of others, and that the government of the United States shall so legislate and act as

to secure the permanent prosperity and happiness of said Indians.

New Mexico was admitted to the Union long after the signing of the Treaty. Its effective date was 1910. *See* 36 Stat. 557 (1910). The contemporaneous Enabling Act contains a disclaimer by New Mexico of the right to public or Indian lands and acknowledged that those lands are subject to the absolute jurisdiction of the United States. It makes clear that New Mexico cannot levy taxes on the tribal lands. This Act of Congress acknowledges that the state is not precluded from taxing property *outside* of an Indian reservation owned or held by any Indian, "save and except such lands as have been granted or acquired by an Act of Congress."

Article XXI, Section 2 of the New Mexico Constitution, a Compact with the United States, contains a forfeiture and disclaimer provision on the part of New Mexico of all lands held by any Indian or Indian tribe, the right or title to which was acquired through the United States. This provision declares that all such lands "shall be exempt from taxation by this state so long and to such extent as the Congress of the United States has prescribed or may hereafter prescribe." [1]

## II.

## APPLICABILITY OF THE FEDERAL PROHIBITION AGAINST A STATE TAX ON THE RESERVATION

The majority opinion virtually ignores the mainline Supreme Court decisions on this subject. Not only does it fail to come to grips with the important aspect of *Mescalero Apache Tribe v. Jones, supra*, it omits the

---

1. It might be argued that the tax here, since it is measured by gross receipts, is not a tax on the land. The matter at issue in *Jones* was a tax that was imposed on the gross receipts of a ski resort from the sale of services and tangible property. Also, the state assessed compensating use taxes against the Tribe in the amount of $5,887.19 in 1968 based on the purchase price of materials used to construct two ski lifts at the resort. The property involved was located outside the Reservation. The Court said that a tax on the land itself was exempt under the

Indian Reorganization Act. The Court also expressed the view that the statutory tax exemption for lands may, in light of its context and purposes, be construed to support an exemption for taxation on income derived from the land even though it was ruled that that principle did not apply in the *Jones* case. But the state would have been precluded from levying the taxes in question if the ski area had been located within the tribal boundaries inasmuch as the State is prohibited from levying taxes on Indian lands or income within the reservation.

parts of the *Jones* opinion which declare that in the special area of state taxation, in the absence of cession of jurisdiction or other federal statutes permitting it, there has been no provision for the states taxing Indian reservation lands or Indian income from within the boundaries of the reservation. In addition, the reference in *Jones* to *McClanahan v. Arizona State Tax Commission*, 411 U.S. 164, 93 S.Ct. 1257, 36 L.Ed.2d 129 (1973), saying that it "lays to rest any doubt in this respect (that is, the immunity of the tribe from taxation within the boundaries of the reservation), by holding that such taxation is not permissible absent Congressional consent," is likewise omitted.

Nor does the majority mention *Bryan v. Itasca County*, 426 U.S. 373, 96 S.Ct. 2102, 48 L.Ed.2d 710 (1976), an even later decision of the Supreme Court which reiterates the inability of the state to tax and contains a thorough discussion of limitations on state taxation of Indian tribes. It, like the other decisions, discusses fully the lack of state power power to tax tribal members and tribal property located on the reservation absent an express consent by the Congress of the United States. Thus, the majority determination is plainly at odds with *Bryan*.

In *Bryan*, the Supreme Court considered the authority of Minnesota to impose a personal property tax on the mobile home of a Chippewa Indian. The mobile home was located on federal trust land. The view that the Minnesota court had taken was that the state was granted implied authority to tax in Public Law 280, § 4(a), 28 U.S.C. § 1360(a), which provides that certain states have "jurisdiction over civil causes of action between Indians or to which Indians are parties which arise in the areas of Indian country listed . . . to the same extent that such State . . . has jurisdiction over other civil causes of action, and those civil laws of such State . . . that are of general application to private persons or private property shall have the same force and effect within such Indian country as they have elsewhere within the State . . . ."

The Minnesota Supreme Court construed the term, civil laws of general application, as including tax statutes because of a proviso in section 4(b), 28 U.S.C. § 1360(b), which denied authorization of the alienation, encumbrance, or taxation of any real or personal property belonging to any Indian or Indian tribe that could be interpreted as limited to property that was held in trust by the United States.

Needless to say, the Supreme Court rejected the narrow and strained construction given by the Minnesota court to the statute. It said that the state's power to tax reservation Indians had been clarified in the several cases whereby Indian immunity absent congressional consent had become established, citing *Mescalero Apache Tribe v. Jones, supra*, and *McClanahan*. So, notwithstanding a federal statute which was not altogether clear, although not susceptible to the construction given by Minnesota, the Supreme Court denied its application.

Also cited by the Supreme Court in *Bryan* was *Moe v. Salish & Kootenai Tribes*, 425 U.S. 463, 465, 96 S.Ct. 1634, 1637, 48 L.Ed.2d 96 (1976), which is relied on by the majority opinion, but which was held by the Court in *Bryan* to be consistent with the line of cases holding that in the absence of congressional consent, the state was disabled from imposing a personal tax on motor vehicles owned by tribal members living on the reservation.

We need not relate the care given to construction of the statute that was in issue in *Bryan*. It is, however, helpful to refer briefly to *McClanahan v. Arizona*, 411 U.S. 164, 93 S.Ct. 1257, 36 L.Ed.2d 129 (1973).

The Arizona tax measure which was sought to be imposed on reservation Indians in *McClanahan* was a personal income tax on income derived from reservation sources. The Supreme Court rejected the argument that the imposition of the tax on a single Indian did not threaten the right of the tribe to self-government. The *McClanahan* Court recognized that the Indian sovereignty doctrine had relevance at least to provide a backdrop for reading the applicable statutes and treaties. *McClanahan* gave effect to the treaty, and the decision is significant

also for its broad determination that the state was barred from imposition of a tax because it was seeking to spread state sovereignty into the Indian reservation.

Nor is *Warren Trading Post v. Arizona Tax Comm'n*, 380 U.S. 685, 85 S.Ct. 1242, 14 L.Ed.2d 165 (1965), to be ignored. Indeed, *Warren* is closely analogous to the case at bar. Arizona had sought to collect a tax of two percent on the gross income derived from sales of Warren Trading Post Company, which was conducting a retail business with Indians on the Arizona part of the Navajo Indian Reservation. Its operation was under a license granted pursuant to the relevant statute. Here again, the Supreme Court of Arizona had upheld the statute and the decision went proceeded directly to the Supreme Court. The effort to tax these proceeds was disallowed because it was inconsistent with federal statutes applicable to the Indians on the Navajo Reservation. In support of its decision, the Court referred to the traditional federal regulation of Indian traders throughout the years which sought to leave the Indians on the reservation free to run it and its affairs without state control. As a result of this absence of state regulation, Arizona did not carry on any governmental responsibilities on the tribal lands. Also pointed out was the fact that the tax frustrated the congressional purpose of insuring that no burdens were being imposed on Indian traders except as authorized by Acts of Congress. Emphasized also was the result of the imposition of financial burdens on the trading post and on the Indians, and resultant disturbance of Congress' design to protect the Indians from unfair pressures. In addition, since the federal legislation had left the state without duties or responsibilities on the reservation, the Court said that it was unbelievable that Congress intended to give the state the privilege of levying this tax. The Arizona Supreme Court decision was, for the foregoing reasons, reversed.

We are not unaware that this is a summing up that the Supreme Court has allowed state sales taxes to be applied to non-Indians on the reservation. Such taxes were imposed in *Moe v. Salish & Kootenai Tribes, supra*, and also in *Ute Indian Tribe v. State Tax Com'n, etc.*, 574 F.2d 1007 (10th Cir. 1978), *cert. denied*, 439 U.S. 965, 99 S.Ct. 452, 58 L.Ed.2d 423. Such taxes imposed on non-Indian consumers do not run counter to the basic restrictions governing a direct or indirect imposition of taxes on Indians or on a tribe.

It must be concluded that, unlike the situation that was present in *Moe, supra*, the tax here is certain to be the burden of the Tribe and of the Indians, and so the majority opinion is incorrect in urging that *Moe* governs this case. It plainly does not. Finally, it is not surprising that the majority opinion soft-pedals the important recent decisions of the Supreme Court, because these cases dictate a conclusion opposite that which the majority reached.

III.

### INAPPLICABILITY OF THE LEGAL INCIDENCE TEST

It is submitted that the legal incidence test has no problem-solving value in the present factual context. The main objection to this incidence approach is that it calls for disregard of the substance of the tax, how it affects the members of the Tribe and the Tribe itself, whether it impedes the basic policies of the United States, which are to develop tribal independence, and the other persistent feature, to protect Indian sovereignty where taxation measures are in question.

The New Mexico Gross Receipts and Compensating Tax Act was enacted in 1966. It is reported in New Mexico Stat. Annot., 1978, Ch. 7, Art. IX, Section 1, *et seq.* The purpose of this Act is reported in NMSA 7–9–2, which provides as follows:

The purpose of the Gross Receipts and Compensating Tax Act is to provide revenue for public purposes by levying a tax on the privilege of engaging in certain activities within New Mexico and to protect New Mexico from the importation into the state property without payment of a similar tax.

Thus, it is intended to be a tax on the privilege of engaging in certain activities within New Mexico. 1978 NMSA 7-9-4 provides:

A. For the privilege of engaging in business, an excise tax equal to four percent of gross receipts is imposed on any person engaging in business in New Mexico.
B. The Tax imposed by this section shall be referred to as the "gross receipts tax."

So, therefore, the New Mexico Gross Receipts and Compensating Tax Act is supposed to close up a loophole as far as the introduction of goods into New Mexico is concerned, and it is also designed to derive revenue from the privilege of engaging in business in New Mexico. It necessarily contemplates that New Mexico sovereignty is at work providing governmental services to the taxed corporations and furnishing protection to them. Where, however, the activity of these companies is conducted in its entirety within the Mescalero Apache Reservation boundaries, it is impossible to see that New Mexico is granting any privilege that is compensable. There are suggestions in the majority opinion and in the opinion of the trial judge that the contractors use New Mexico highways to get to the construction sites, but this, however, is ordinary activity engaged in by all persons who drive on interstate and other highways in New Mexico. It is outside the general purposes that are stated in the statute. Therefore, it is, on its face, highly questionable.

The majority says that this court is bound by the construction on the part of the New Mexico courts which have held that the legal incidence of the tax is on the contractor. The mere statement of this refutes it. This court is not bound by a New Mexico determination which is so purely federal, which is related to the provision in the Commerce Clause, and which has such a long tradition of federal character. *See Diamond National v. State Equalization Bd.*, 425 U.S. 268, 96 S.Ct. 1530, 47 L.Ed.2d 780 (1976). *Diamond* is a brief per curiam opinion, and the question was whether state and local sales taxes fell upon a national bank as the purchaser of goods rather than

upon vendors, whereby the bank was exempt from the taxes under a federal statute which was in effect at the relevant time. The Supreme Court said:

The judgment is reversed. We are not bound by the California court's contrary conclusion and hold that the incidence of the state and local sales taxes falls upon the national bank as purchaser and not upon the vendors. The national bank is therefore exempt from the taxes under former 12 U.S.C. (section) 548 (1964 ed.), which was in effect at the time here pertinent. *First Agricultural Nat. Bank v. Tax Comm'n*, 392 U.S. 339, 346–348, 88 S.Ct. 2173, 20 L.Ed.2d 1138 (1968). 425 U.S. at 268, 96 S.Ct. at 1530.

In *First Agricultural Nat. Bank v. Tax Comm'n, supra*, a Massachusetts sales tax and use tax as applied to national banks was held to be invalid because it was in one of the areas in which the Congress had consented to states taxing national banks.

An important objection to the use of the "legal incidence" test is that it is so vague and abstract and thus it can give one any result that he seeks. Consequently, it is merely a use of high sounding words which cloak a multitude of evils. For example, it has been held that "the legal incidence of a tax falls upon that entity or person to whom the state under a reasonable interpretation of its entire taxing scheme ultimately looks for satisfaction of the exaction." *United States v. State Tax Commission of the State of Mississippi*, 378 F.Supp. 558, 566 (S.D.Miss.1974). It has also been held in a Washington test that the incidence of a tax "is its impact, effect, or imposition upon the person, property or transaction that bears the ultimate money burden." *P. Lorillard Co. v. City of Seattle*, 8 Wash.App. 510, 507 P.2d 1212, 1216 (1973).

In the case of *Railway Express Agency, Inc. v. Virginia*, 358 U.S. 434, 439, 79 S.Ct. 411, 415, 3 L.Ed.2d 450 (1959), the Supreme Court used the term in connection with a Virginia franchise tax measured by gross receipts from transportation within the state—through the state or into or out of the state. It held that the tax was not

violative of the Commerce Clause. This was designed to take the place of all property taxes levied against foreign corporations. The Supreme Court had to answer the question whether the tax was on personal property of the express company or on the privilege of doing business. The Court said that the statute undertook to tax the latter. In describing the contention of the appellant Express Company, the Court said:

It readily admits that the latter agreements are "valuable contract rights" and contribute a principal element to the "going concern value" of its business in the Commonwealth. Subsuming that a valid tax levy might be levied on such intangibles, it argues, however, that the incidence of the tax is on appellant's privilege to carry on an exclusively interstate business in Virginia rather than on intangible property. Our sole question under the Commerce Clause is whether the tax in practical operation is on property or on privilege.

358 U.S. at 439, 79 S.Ct. at 415. It is believed that the Court was there using "incidence" as meaning the burden of the tax.

Again, in *Polar Co. v. Andrews*, 375 U.S. 361, 84 S.Ct. 378, 11 L.Ed.2d 389 (1964), it was said:

The incidence of the tax appears to be upon the activity of processing or bottling milk in a plant located within Florida, and not upon work performed on a federal enclave or upon the sale and delivery of milk occurring within the boundaries of federal property.

375 U.S. at 382, 84 S.Ct. at 390.

Thus, it was using "incidence" as that to which the tax was addressed. This was also the approach in *Department of Revenue v. James B. Beam Distilling Co.*, 377 U.S. 341, 84 S.Ct. 1247, 12 L.Ed.2d 362 (1964). Again, in *Halliburton Oil Well Co. v. Reily*, 373 U.S. 64, 83 S.Ct. 1201, 10 L.Ed.2d 202 (1963), Mr. Justice Clark in his dissenting opinion spoke of incidence as being "the moment that the product becomes a part of the mass of property within the State. It matters not what happens to the property subse-

quently. The tax attaches to the property in its form at that specific time." 373 U.S. at 79, 83 S.Ct. at 1209. *See also Arizona Public Service Co. v. Snead*, 441 U.S. 141, 99 S.Ct. 1629, 60 L.Ed.2d 106 (1979), where it was used in relationship to the gross receipts tax credit. It was said that this was being shifted to the generating utility.

In *Complete Auto Transit, Inc. v. Brady*, 430 U.S. 274, 97 S.Ct. 1076, 51 L.Ed.2d 326 (1977), a state gross income tax had been applied to transportation of cars outside the state and into the state. The court held that the incidence of the tax was on the privilege of doing business and could be levied. The Court there said that the tax looked only to the incidence of it and disregarded its practical effects.

What has been said plainly shows that incidence of the tax should not be the test in dealing with a conflict between a state an an Indian tribe. Blind adherence to the incidence test is designed to bring about an effect which would be out of harmony with the history, the terms of the organic laws, and the cases.

Finally, we have not been able to find a precedent for using this vague phrase in order to validate a state law imposing a tax on an Indian tribe. To do so constitutes the use of "magic words" similar to those described by Justice Clark in *Railway Express Agency, Inc. v. Virginia, supra. See* 358 U.S. 434 at 441, 79 S.Ct. 411, 416, 3 L.Ed.2d 450.

Based upon the fact that the majority opinion is at odds with the prior law, plus the fact that it is an invasion of Indian sovereignty, and is inconsistent with the underlying policies of the United States in regard to developing the independence of the tribes of Indians, the judgment should be reversed.

McKAY, Circuit Judge, dissenting, in which WILLIAM E. DOYLE, Circuit Judge, joins:

The majority determines that a passage from *Mescalero Apache Tribe v. Jones*, 411 U.S. 145, 148, 93 S.Ct. 1267, 1270, 36 L.Ed.2d

114 (1973) "leaves no discretion for any doctrine of preemption" in analyzing the "application of state laws on the Mescalero Reservation." Maj. op at 970. To reach that conclusion it necessarily must ignore the requirements of *McClanahan v. Arizona State Tax Commission*, 411 U.S. 164, 93 S.Ct. 1257, 36 L.Ed.2d 129 (1973), decided the same day as *Jones*. *McClanahan* leaves no doubt that preemption analysis is the fundamental starting point for resolution of jurisdictional disputes between states and Indian tribes. 411 U.S. at 172, 93 S.Ct. at 1262. By refusing to undertake that necessarily complex, detailed analysis, this court abdicates the duty imposed on it by the Supreme Court and reaches a result contrary to that which the mandated analysis would produce.

## I.

The Mescalero Apache Tribe constructed a housing project for members of the Tribe and a resort complex to provide a source of revenue for tribal government activities on the reservation. The resort complex is essentially a government revenue measure much like utilities created by states and municipalities. In order to keep the bids down, the Tribe entered into construction contracts that obligate the Tribe to indemnify the contractors for any state gross receipt taxes which the State might levy on the contract. The Tribe has consistently taken the position that the State of New Mexico may not legally increase the Tribe's direct governmental costs by imposing a tax calculated on its contracts for tribal services.[1] The State has nonetheless levied its gross receipts and compensating tax[2] on monies received by the non-Indian contractors for work on the projects—a levy which must be paid by the Tribe if the State has authority to impose this tax.

The Tribe sought a declaration in federal district court that the State may not collect the tax. On one narrow subsidiary issue

the Tribe prevailed: The contractor for the reservation housing project was held to be the Tribe's agent in purchasing building materials. The tax on the purchase of materials therefore fell upon the Tribe itself and was held to be invalid. *Mescalero Apache Tribe v. O'Cheskey*, 439 F.Supp. 1063, 1068–71 (D.N.M.1977). The State has appealed that portion of the district court's decision. The trial court was correct in the resolution of the agency issue.

On the more fundamental issue—the application of the tax to the contractors' gross receipts for services to the Tribe—the district court held the tax valid. The court admitted there was "no question that the imposition of the tax will have an economic effect upon the Tribe," 439 F.Supp. at 1072, but believed the tax was only an "indirect burden" which would not infringe "on the right of reservation Indians to make their own laws and be ruled by them." *Id.* at 1072–73. The Tribe appeals from this ruling.

The federal government was heavily involved in the arrangements for the construction projects. For example, the Economic Development Administration, as the principal source of funds for the resort project, approved the selection of contractors and the individual contracts. Most of the remaining funds for the project came from a Bank of New Mexico loan, ninety percent of which is guaranteed by the Secretary of the Interior under the Indian Financing Act of 1974, 25 U.S.C. §§ 1451 *et seq.*

The Tribe has passed its own gross receipts tax and licensing ordinances. At the time of this suit, the Tribe had not imposed its tax or its licensing requirements on any businesses. The Tribe's failure to levy the tax on the contractors here does not reflect any deference to a perceived higher state authority. The Tribe reasonably decided that, since the tax funds would ultimately come from tribal coffers, imposition of the

---

1. No negative significance should be attached to the fact that the contracts were drawn and the funding arrangements made in an obvious attempt to avoid state taxation.

2. N.M.Stat.Ann. §§ 72–16A-1 *et seq.* (Supp. 1975).

tax would produce no net benefit to the Tribe.

On the basis of these facts, three overlapping theories are evident, each of which is sufficient to preclude state taxation. The first theory is that federal power has preempted state taxation on the Mescalero reservation. The second is that the legal incidence test is inapplicable to Indian taxation questions. Finally, the Tribe's own regulatory scheme preempts a state regulatory tax.

## II.

In jurisdictional disputes between state governments and Indian tribes, we are required to determine whether the applicable treaty and federal statutes, read against the "backdrop" of Indian sovereignty, preempt exercises of state power. *See McClanahan v. Arizona State Tax Commission*, 411 U.S. at 172, 93 S.Ct. at 1262; *Mescalero Apache Tribe v. Jones*, 411 U.S. at 148, 93 S.Ct. at 1270; *Warren Trading Post Co. v. Arizona Tax Commission*, 380 U.S. 685, 690–91, 85 S.Ct. 1242, 1245–1246, 14 L.Ed.2d 165 (1965). Under a standard of construction followed from the time of the Marshall Court, we must construe the applicable treaty and statutes liberally in order to further Indian interests. *See, e. g., Bryan v. Itasca County*, 426 U.S. 373, 392, 96 S.Ct. 2102, 2112, 48 L.Ed.2d 710 (1976); *McClanahan v. Arizona State Tax Commission*, 411 U.S. at 174, 93 S.Ct. at 1263; *Squire v. Capoeman*, 351 U.S. 1, 6–7, 76 S.Ct. 611, 614–615, 100 L.Ed. 883 (1956); *Carpenter v.*

*Shaw*, 280 U.S. 363, 366–67, 50 S.Ct. 121, 122–123, 74 L.Ed. 478 (1930); *Worcester v. Georgia*, 31 U.S. (6 Pet.) 515, 582, 8 L.Ed. 483 (1832).[3] In contrast to general preemption analysis, with Indian cases we presume that, absent clear congressional statement, federal law has preempted state jurisdiction. *See Bryan v. Itasca County*, 426 U.S. at 392–93, 96 S.Ct. at 2112–2113; D. Getches, D. Rosenfelt & C. Wilkinson, *Cases and Materials on Federal Indian Law* 295–99 (1979). Because Congress has spoken so clearly in favor of federal preemption with respect to the Mescalero Apaches, however, it is apparent that there is federal preemption in this case even without the benefits of that presumption.

Our analysis begins with the applicable treaty. *See McClanahan v. Arizona State Tax Commission*, 411 U.S. at 173–74, 93 S.Ct. at 1262–1263.[4] In Article 1 of that document, the Tribe submits itself *"exclusively* [to] the laws, jurisdiction, and government of the United States of America."* Treaty with the Apaches, July 1, 1852, 10 Stat. 979 (1852) (emphasis added). Further, the treaty provides that the *United States* shall "designate, settle, and adjust [the Tribe's] territorial boundaries, and pass and execute . . . such laws as may be deemed conducive to the prosperity and happiness of [the Mescalero Apaches]." *Id.*, art. 9, 10 Stat. 980. Despite these explicit statements of plenary federal power, the district court inexplicably and erroneously did not rely on the treaty language in its analysis.[5]

---

**3.** The applicable treaty itself mandates "liberal construction . . . to the end that . . . the government of the United States shall so legislate and act as to secure the permanent prosperity and happiness of said Indians." Treaty with the Apaches, July 1, 1852, art. 11, 10 Stat. 980 (1852). It must be assumed that the federal courts are included in "the government of the United States."

**4.** In *Mescalero Apache Tribe v. Jones*, 411 U.S. 145, 93 S.Ct. 1267, 36 L.Ed.2d 114 (1973), decided the same day as *McClanahan*, the Court did not analyze the Mescalero treaty. However, *Jones* dealt with state taxation of tribal proprietary activities on *off-reservation* lands, an issue fundamentally different from that of the instant case. Hence, the Court's rejection

of "exclusive [federal] jurisdiction over the Tribe for all purposes," *id.* at 147, 93 S.Ct. at 1271, does not imply a rejection of exclusive on-reservation jurisdiction. *See id.* at 149, 93 S.Ct. at 1270.

**5.** Without a textual analysis the majority in this case denigrates the importance of the treaty. *See* maj. op. at 971. If indeed the treaty purported to be "only" a treaty of peace and friendship, as the majority asserts, *id.*, it would still mean a great deal. In any case, what the treaty purports to be is a question requiring close textual analysis by this court.

The majority questions in passing the validity of the treaty. In so doing, the majority gives weight to a position that was not argued before

The importance of the treaty's exclusivity language cannot be overstated. It fundamentally distinguishes the instant case from prominent precedents in which federal preemption was not found.[6] For example, in *Moe v. Confederated Salish & Kootenai Tribes*, 425 U.S. 463, 96 S.Ct. 1634, 48 L.Ed.2d 96 (1976), the Court approved imposition of a state cigarette tax on reservation sales to non-Indians. The applicable treaty, however, contains no broad exclusivity language. *See* Treaty of Hell Gate, July 16, 1855, 12 Stat. 975 (1855).[7] Our decision in *Ute Indian Tribe v. State Tax Commission*, 574 F.2d 1007 (10th Cir. 1978), *cert. denied*, 439 U.S. 965, 99 S.Ct. 452, 58 L.Ed.2d 423 (1978), is similarly distinguishable. The language of the Mescalero Apache treaty also strengthens and widens the import of cases such as *McClanahan v. Arizona State Tax Commission*, 411 U.S. 164, 93 S.Ct. 1257, 36 L.Ed.2d 129 (1973), where federal preemption was narrowly found despite non-exclusive treaty language.[8] *See* 411 U.S. at 174, 93 S.Ct. at 1263.

The treaty is also important because it aids in the interpretation of other federal

this court by the State and necessarily relies on facts *not found by the court below*. The district court specifically refused to consider New Mexico's contention that the treaty was invalid because *signed by improper representatives of* the Mescalero Apaches. The court also declined to "determine whether the nature of the treaty somehow gives the . . . Tribe *fewer* rights than other treaties give to other Indian tribes." *Mescalero Apache Tribe v. O'Cheskey*, 439 F.Supp. 1063, 1066 n.5 (D.N.M.1977) (emphasis added). The court's reluctance to reopen ancient ratification disputes is understandable, *see* F. Cohen, *Handbook of Federal Indian Law* 34 (1942), but its failure to study the treaty language and to compare that language with other treaties is not. *See*, 439 F.Supp. at 1073–74.

6. No recent Supreme Court case construes a still vital treaty containing similarly powerful language. The treaty in *Puyallup Tribe, Inc. v. Dep't of Game*, 433 U.S. 165, 97 S.Ct. 2616, 53 L.Ed.2d 667 (1977), did give the Tribe "exclusive use" of certain land, but the Tribe had long before given up exclusive jurisdiction over the land. *Id.* at 174–75, 97 S.Ct. at 2622–2623.

7. *Moe* also differs from this case because there (1) the district court found that it was "the *non-Indian consumer or user who saves the tax* and reaps the benefit of the tax exemption," 425 U.S. at 481–82, 96 S.Ct. at 1645; (2) the burden on the Indian seller was "not, strictly speaking, a tax at all," *id.* at 483, 96 S.Ct. at 1646; and (3) no tax effects fell on the tribe per se and therefore tribal self-government was not implicated; individual salesmen were obligated to precollect the tax. *See also Fort Mojave Tribe v. County of San Bernardino*, 543 F.2d 1253, 1255 n.2 (9th Cir. 1976), *cert. denied*, 430 U.S. 983, 97 S.Ct. 1678, 52 L.Ed.2d 377 (1977) (economic burden of tax unclear).

*Moe*'s rationale is also theoretically suspect. *The Court accepted the district court's finding* that the burden of the tax falls on the non-Indian consumer because "[t]hat finding necessarily follows from the Montana statute, which provides that the cigarette tax 'shall be conclusively presumed to be [a] direct [tax] on the retail consumer precollected for the purpose of convenience and facility only.'" 425 U.S. at 482, 96 S.Ct. at 1645. Although there is legal authority for that finding, *see, e. g., United States v. Tax Comm'n*, 421 U.S. 599, 608, 95 S.Ct. 1872, 1878, 44 L.Ed.2d 404 (1975), it will not withstand the scrutiny of economic analysis. Unless the demand curve for a product is perfectly inelastic—so that any price fluctuation does not affect quantity demanded—an increase in price via a tax will result in lower quantities sold. An assumption that cigarette sales are impervious to price changes is most questionable. However the Indian seller acts to counteract the tax's effects—e. g., by lowering his own prices—he is forced to absorb part of the burden. In only the most narrow terms can the burden on the seller not be considered a tax. *See* Barsh, *Issues in Federal, State, and Tribal Taxation of Reservation Wealth: A Survey and Economic Critique*, 54 Wash.L.Rev. 531, 537–40, 566–68 (1979); Barsh, *The Omen: Three Affiliated Tribes v. Moe and the Future of Tribal Self-Government*, 5 Am.Ind.L.Rev. 1, 46–47 (1977).

8. In *McClanahan*, the Court answers negatively "the narrow question whether the State may tax a reservation Indian for income earned exclusively on the reservation." 411 U.S. at 168, 93 S.Ct. at 1260.

The analysis in the text should not suggest that the treaty interpreted in *McClanahan* provides the Navajo Nation with only narrow protection. Indeed, the treaty provides for exclusive use and occupancy of reservation lands by the Navajos. Furthermore, it excludes non-Navajos, except those authorized, from entering the reservation. Treaty with the Navajo Tribe, 15 Stat. 668 (1868). *See McClanahan v. Arizona State Tax Comm'n*, 411 U.S. at 174, 93 S.Ct. at 1263. Nevertheless, in federal preemption analysis we look first for explicit grants of federal jurisdiction. In that respect the Treaty with the Apaches is a far stronger treaty.

preempting statutes. For example, it removes from consideration any narrow reading of the Enabling Act for New Mexico, 36 Stat. 557 (1910). That Act, as a condition for admission to statehood, required New Mexico to disclaim

> all right and title . . . to all lands lying within said boundaries owned or held by any Indian or Indian tribes the right or title to which shall have been acquired through or from the United States or any prior sovereignty, and that until the title of such Indian or Indian tribes shall have been extinguished the same shall be and remain subject to the disposition and *under the absolute jurisdiction and control of the Congress of the United States*; . . . but nothing herein, or in the ordinance herein provided for, shall preclude the said State from taxing, as other lands and other property are taxed, any lands and other property outside of an Indian reservation owned or held by any Indian, save and except such lands as have been granted or acquired as aforesaid or as may be granted or confirmed to any Indian or Indians under any Act of Congress, but said ordinance shall provide that all such lands shall be exempt from taxation by said State so long and to such extent as Congress has prescribed or may hereafter prescribe.

*Id.* at 558–59 (emphasis added).[9] To counter the apparent effects of this Act, the State of New Mexico points us to *Organized Village of Kake v. Egan*, 369 U.S. 60, 82 S.Ct. 562, 7 L.Ed.2d 573 (1962), in which the Supreme Court interpreted a similar state enabling act. Brief for the State of New Mexico at 8. The Court there held that

" 'absolute' federal jurisdiction is not invariably exclusive jurisdiction," 369 U.S. at 68, 82 S.Ct. 567, and stated that the language effected a state disclaimer only of proprietary, and not governmental interests. *Id.* at 69, 82 S.Ct. at 567. However, the Court has since limited the effect of *Egan*. In *McClanahan v. Arizona State Tax Commission*, 411 U.S. 164, 93 S.Ct. 1257, 36 L.Ed.2d 129 (1973), the Court explained that *Egan* "came in the context of a decision concerning the fishing rights of *non-reservation* Indians. It did not purport to provide guidelines for the exercise of state authority in areas set aside by treaty for the exclusive use and control of Indians." *Id.* at 176 n.15, 93 S.Ct. at 1264 n.15 (emphasis in original). This case, like *McClanahan*, involves attempted state interference on a reservation set aside for the use and control of Indians. Furthermore, in this case the treaty explicitly provides for exclusive jurisdiction in the federal government. Here "absolute" jurisdiction is, because of the treaty language, "exclusive" jurisdiction.

This interpretation of the Treaty with the Apaches has been accepted elsewhere. In a case involving the Mescalero Apaches, the New Mexico Supreme Court also viewed the *McClanahan* clarification of *Egan* as a refusal "to extend the concept of concurrent federal and state jurisdiction to cases which arise in areas set aside by treaty for the exclusive use and control of Indians." *Chino v. Chino*, 90 N.M. 203, 205, 561 P.2d 476, 478 (1977). The court would not countenance state jurisdiction over fee patent land, occupied by a non-Mescalero, within the boundaries of the reservation.[10]

---

**9.** The latter part of this passage was relied upon in *Mescalero Apache Tribe v. Jones*, 411 U.S. 145, 149–50, 93 S.Ct. 1267, 1270–1271, 36 L.Ed.2d 114 (1973), in permitting taxation, not otherwise congressionally proscribed, of off-reservation Indian activities. We do not, of course, have a similar situation before us.

**10.** The State of New Mexico argues that *Chino*'s import is limited to its particular facts—a dispute between two Indians (one not a Mescalero Apache) over Indian lands. Brief for the State of New Mexico at 8. Given the quotation interpreting *McClanahan*, the court's rationale cannot be so limited. The State further argues

that "[w]here . . . non-Indian corporations do work on a reservation, the Supreme Court of New Mexico has clearly indicated they are subject to tax." *Id.* (citing *Prince v. Board of Educ.*, 88 N.M. 548, 543 P.2d 1176 (1975)). The language of *Prince* is, without question, very broad. *See, e. g.*, 543 P.2d at 1181. However, the Navajo treaty involved in *Prince* did not give exclusive jurisdiction to the United States. Furthermore, the dictum of *Prince* dealt with state taxation of private property located on the reservation, but owned by non-Indian corporations. It did not deal with a

Although the treaty and the enabling act alone are sufficient to create federal preemption, several other factors also mandate the conclusion that the state tax is precluded by federal preemption.[11] (1) The Mescalero Apache Constitution, federally approved pursuant to the Indian Reorganization Act of 1934, 48 Stat. 984, 25 U.S.C. § 476, gives the Tribal Council authority to regulate all business and industry on the reservation, including the power to issue licenses and assess taxes. Mescalero Apache Tribe Revised Const. art. 11, § 1(d), (s). (2) Under Public Law 280, the State of New Mexico "could have unilaterally assumed jurisdiction over . . . the . . Reservation ˙at any point during the 15 years between 1953 and 1968," McClanahan v. Arizona State Tax Commission, 411 U.S. at 177 n.17, 93 S.Ct. at 1265 n.17, yet it did not do so. See Pub.L. 280, 67 Stat. 590 (1953). Since 1968, tribal consent for state assumption of jurisdiction has been required. 25 U.S.C. §§ 1321–22.

> [The] Act [requiring tribal consent] cannot be read as expressly conferring tax immunity upon Indians. But we cannot believe that Congress would have required the consent of the Indians affected

. . . if the States were free to accomplish the same goal unilaterally by simple legislative enactment. . . . Unless the State is willing to defend the position that it may constitutionally administer its tax system altogether without judicial intervention, . . . the admitted absence of either civil or criminal jurisdiction would seem to dispose of the case.

McClanahan v. Arizona State Tax Commission, 411 U.S. at 178–79, 93 S.Ct. at 1265.[12] See also Kennerly v. District Court, 400 U.S. 423, 424–30, 91 S.Ct. 480, 480–484, 27 L.Ed.2d 507 (1971). (3) The federal government, particularly the Economic Development Administration, was pervasively involved in the project. Even individual contracts were approved by the E.D.A.

The treaty and statutes discussed above, coupled with the "inherent powers of a limited sovereignty which has never been extinguished," F. Cohen, Handbook of Federal Indian Law 122 (1942) (emphasis deleted), quoted in United States v. Wheeler, 435 U.S. 313, 322, 98 S.Ct. 1079, 1085, 55 L.Ed.2d 303 (1978),[13] protect the territorial integrity

---

gross receipts tax on funds provided by the Tribe and the federal government for services performed directly for the Tribe. Even if we were bound by Prince—and we are not—we would not have to repudiate that case in order to find federal preemption in this one.

**11.** Although the district court found that Indian traders' licenses could not properly be issued to the contractors, 439 F.Supp. at 1067–68, that fact does not preclude a finding of preemption. See McClanahan v. Arizona State Tax Comm'n, 411 U.S. at 170 n.6, 93 S.Ct. at 1261 n.6.

**12.** Although McClanahan involved state income taxation of individual Indians, Public Law 280 deals with state jurisdiction over acts and events occurring on Indian reservations, not merely with personal jurisdiction over individuals. Even if New Mexico had asserted jurisdiction, that jurisdiction would not extend to taxation of reservation Indians or Indian property. Bryan v. Itasca County, 426 U.S. 373, 96 S.Ct. 2102, 48 L.Ed.2d 710 (1976).

**13.** The Supreme Court continues to recognize that Indian tribes are possessed of attributes of sovereignty. See, e. g., Santa Clara Pueblo v. Martinez, 436 U.S. 49, 55–56, 98 S.Ct. 1670, 1675–1676, 56 L.Ed.2d 106 (1978); United

States v. Wheeler, 435 U.S. 313, 322–28, 98 S.Ct. 1079, 1085–1089, 55 L.Ed.2d 303 (1978); Oliphant v. Suquamish Indian Tribe, 435 U.S. 191, 208, 98 S.Ct. 1011, 1020, 55 L.Ed.2d 209 (1978); United States v. Antelope, 430 U.S. 641, 646, 97 S.Ct. 1395, 1398, 51 L.Ed.2d 701 (1977); United States v. Mazurie, 419 U.S. 544, 557, 95 S.Ct. 710, 717, 42 L.Ed.2d 706 (1975).

The State of New Mexico apparently believes that the tribal sovereignty and federal preemption doctrines are mutually exclusive. See Brief for the State of New Mexico at 9–10. Certainly from a purely theoretical standpoint the two sources of tribal power do not easily coexist; an increase in federal power over the Tribe must result in a diminution of sovereignty as traditionally understood. However, in the complex body of federal Indian law the two doctrines reinforce one another. Both doctrines have arisen as limitations on state jurisdiction. It is in this consistent sense that the Supreme Court's view of sovereignty—as a backdrop against which to view treaties and statutes—should be understood. See D. Getches, D. Rosenfelt & C. Wilkinson, Cases and Materials on Federal Indian Law 296–97 (1979); Comment, The Indian Battle for Self-Determination, 58 Cal.L.Rev. 445, 451–52 (1970).

of the Mescalero Apache reservation. Protection of territorial integrity has become increasingly important because Indian self-government and self-determination have become the stated goals of federal Indian law. *See Santa Clara Pueblo v. Martinez,* 436 U.S. 49, 62, 98 S.Ct. 1670, 1679, 56 L.Ed.2d 106 (1978); *Fisher v. District Court,* 424 U.S. 382, 391, 96 S.Ct. 943, 948, 47 L.Ed.2d 106 (1976); *Morton v. Mancari,* 417 U.S. 535, 551–55, 94 S.Ct. 2474, 2483–2485, 48 L.Ed.2d 290 (1974). Congress has "recognize[d] the obligation of the United States to respond to the strong expression of the Indian people for self-determination." 25 U.S.C. § 450a(a) (1976). *See* McCoy, *The Doctrine of Tribal Sovereignty: Accommodating Tribal, State, and Federal Interests,* 13 Harv.C.R.-C.L.L.Rev. 357, 393–95 (1978). The principle of self-determination may be said to *require* protection of territoriality. *See id.* at 390 & 390 n.154. *See also Merrion v. Jicarilla Apache Tribe,* 617 F.2d 537 at 542–543 (10th Cir. 1980).

In spite of changing notions about tribal sovereignty, "it would vastly oversimplify the problem to say that nothing remains of the notion that reservation Indians are a separate people to whom state jurisdiction, and therefore state tax legislation, may not extend." *McClanahan v. Arizona State Tax Commission,* 411 U.S. at 170, 93 S.Ct. at 1261. *See United States v. Antelope,* 430 U.S. 641, 646, 97 S.Ct. 1395, 1398, 51 L.Ed.2d 701 (1977). Indeed, the Supreme Court views state taxation of Indian lands or income as a "special area," with a still diminished justification for breaching reservation boundaries. *Mescalero Apache Tribe v. Jones,* 411 U.S. 145, 148, 93 S.Ct. 1267, 1270, 36 L.Ed.2d 114 (1973). *See Bryan v. Itasca County,* 426 U.S. 373, 96 S.Ct. 2102, 48 L.Ed.2d 710 (1976). Since the Mescalero Apache Tribe's reservation is afforded unusually strong protection, the State's imposition of its taxes there is especially disfavored.

Since the Tribe's insulation from state taxation is not based primarily on principles of retained sovereignty, we need not determine whether aspects of sovereignty have been surrendered "by implication as a nec-essary result of [the Tribe's] dependent status." *United States v. Wheeler,* 435 U.S. 313, 323, 98 S.Ct. 1079, 1086, 55 L.Ed.2d 303 (1978). *See Oliphant v. Suquamish Indian Tribe,* 435 U.S. 191, 208, 98 S.Ct. 1011, 1020, 55 L.Ed.2d 209 (1978). The language of *Wheeler* and *Oliphant* "should not be mistaken for a new test that replaces the examination of relevant treaties and statutes." Mettler, *A Unified Theory of Indian Tribal Sovereignty,* 30 Hastings L.Rev. 89, 110 (1978). In any case, there is no reason here to imply divestiture: "In most respects the *Oliphant* Court's rationale does not apply to noncriminal cases." Collins, *Implied Limitations on the Jurisdiction of Indian Tribes,* 54 Wash.L.Rev. 479, 508 (1979).

Because the applicable treaty and federal statutes, read against the backdrop of inherent tribal sovereignty, preempt state jurisdiction in this case, the State of New Mexico may not tax the receipts of non-Indian contractors for work done for the Tribe on the Mescalero Apache reservation.

### III.

This case may also be resolved on the ground that the economic burden of this tax falls, without question, on the Tribe itself. Regardless of any dispute we might have about the level of federal preemption, there is manifestly no state power to tax Mescalero Apache reservation Indians directly. *See McClanahan v. Arizona State Tax Commission,* 411 U.S. 164, 93 S.Ct. 1257, 36 L.Ed.2d 129 (1973).

The burden falls on the Tribe because the Tribe is obligated, by contract, to indemnify the contractors for any state gross receipt taxes assessed on the proceeds of these contracts. *See Mescalero Apache Tribe v. O'Cheskey,* 439 F.Supp. 1063, 1072 (D.N.M. 1977). The State argues that the Tribe could have secured funds for the taxes from the federal government. Grants from the Economic Development Administration typically include allocations to cover state and local taxes. However, it is not merely the election of the Tribe which determines where the ultimate burden falls. We can-

not assume that the Tribe has unlimited access to the federal treasury. Indeed, we should expect the Tribe to minimize the costs of any particular project so as to maximize chances for further grants. The E.D.A. grants are the Tribe's resources, not the State's. The State may not insist that the Tribe secure extra funds in order to be held liable for state taxes.

The district court held that the legal incidence test controls and, because the legal incidence of the tax falls on the contractors rather than the Tribe, the tax is valid. 439 F.Supp. at 1072. However, the legal incidence test, born to resolve federal-state conflicts, does not apply here.

The legal incidence test was developed in cases where the ultimate economic burden of a state tax on contractors fell on the federal government. *See* L. Tribe, *American Constitutional Law* 396 (1978). Mechanical application of the legal incidence test is permissible in such circumstances because no significant interference with federal activities results. *See United States v. New Mexico*, 581 F.2d 803, 806 (10th Cir. 1978).[14] Measured against the vast resources of the federal treasury, the actual burdens of state taxation are insignificant. In contrast, the treasuries of nearly all Indian tribes are small: "On virtually every scale of measurement—employment, income, education, health—the condition of Indian people ranks at the bottom." President's Message to Congress Transmitting Recommendations for Indian Policy, H.R.Doc. No. 363, 91st Cong., 2d Sess. 1 (1970). *See also* D. Getches, D. Rosenfelt & C. Wilkinson, *Cases and Materials on Federal Indian Law* 9 (1979). To ignore the actual effects of state taxation on Indian tribes is to ignore the lessons of *McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 4 L.Ed. 579 (1819).

It is because of the broad tax base of the federal government that tax exemptions to federal contractors are unjustified. Taxation of the contractors causes no "actual interfering or destructive effects upon the . . . government." *Oklahoma Tax Commission v. Texas Co.*, 336 U.S. 342, 364, 69 S.Ct. 561, 573, 93 L.Ed. 721 (1949). The repudiation of the federal instrumentality doctrine in *Texas Co.* did not also repudiate *McCulloch*'s protection of those constitutional units whose economic stability is less clearly evident. Indeed, the Supreme Court has recently reiterated the concern that economically more powerful units not ·overwhelm the less secure. *National League of Cities v. Usery*, 426 U.S. 833, 96 S.Ct. 2465, 49 L.Ed.2d 245 (1976). *See Kern-Limerick, Inc. v. Scurlock*, 347 U.S. 110, 116–17, 74 S.Ct. 403, 407–408, 98 L.Ed. 546 (1954; Note, *Federal Tax Immunity and the Legal Incidence of the Maine Sales Tax,* 29 Maine L.Rev. 149, 153–54 (1977). Our own concern for the solvency of tribes, whose "status [is] higher than that of states," *Native American Church v. Navajo Tribal Council*, 272 F.2d 131, 134 (10th Cir. 1959), dictates that the legal incidence test not be applied in Indian cases.[15]

We are not without suggestions from the Supreme Court that the legal incidence test is inappropriate when Indian tribes are involved. In *Oklahoma Tax Commission v. Texas Co.*, 336 U.S. 342, 69 S.Ct. 561, 93 L.Ed. 721 (1949), the Court permitted imposition of a tax on non-Indian lessees operating on Indian lands. The Court specifically noted, however, that there was "no possibility that ultimate liability for the taxes may fall upon the [Indian] owner of the land." *Id.* at 353, 69 S.Ct. at 567. *See* Comment, *The Case for Exclusive Tribal Power to Tax Mineral Lessees of Indian Lands,* 124 U.Pa. L.Rev. 491, 509 (1975). In contrast, we have before us a finding that "[t]here is no question that the imposition of the tax will

---

14. In *United States v. New Mexico*, 581 F.2d 803 (10th Cir. 1978), we applied the formalistic legal incidence test and upheld the application of the New Mexico gross receipts tax to federal contractors.

15. "A wholly different approach is taken concerning state taxation in Indian law. The cases do not revolve around whether the state tax is 'nondiscriminatory' or where the 'legal incidence' falls . . . ." D. Getches, D. Rosenfelt & C. Wilkinson, *Cases and Materials on Federal Indian Law* 298 (1979).

have an economic effect upon the Tribe." *Mescalero Apache Tribe v. O'Cheskey*, 439 F.Supp. 1063, 1072 (D.N.M.1977).[16]

If we look to actual incidence, this case falls clearly under the *McClanahan* rule: state taxation of reservation Indians for on-reservation activities is impermissible absent express congressional authority. 411 U.S. at 171, 93 S.Ct. at 1261. Because of the Mescalero Apache treaty and the incidence of the tax on the Tribe itself (thereby implicating self-government), this case falls *a fortiori* within the *McClanahan* rationale.

## IV.

The proper result in this case is mandated by yet another rationale. Regardless of the level of federal preemption, the Tribe's own regulatory powers may preempt exercises of state regulation.

Limiting state jurisdiction within tribal territory recognizes the "right of reservation Indians to make their own laws and be ruled by them." *Williams v. Lee*, 358 U.S. 217, 220, 79 S.Ct. 269, 270, 3 L.Ed.2d 251 (1959), *quoted in McClanahan v. Arizona State Tax Commission*, 411 U.S. at 171–72, 93 S.Ct. at 1262. Indigenous Indian institutions are permitted to flourish, a goal recognized by the New Mexico Supreme Court: "For a state to move into areas where Indian law and procedure have not achieved the degree of certainty of state law and procedure would deny Indians the opportunity of developing their own systems." *Chino v. Chino*, 90 N.M. 203, 206, 561 P.2d 476, 479 (1977). *See Williams v. Lee*, 358 U.S. at 223, 79 S.Ct. at 272.

Among the areas of self-government to be developed is the regulation of business activities on the reservation. As an element of sovereignty, the Tribe retains the "power of determining the conditions upon which persons shall be permitted to enter its domain, to reside therein, and to do business." *Powers of Indian Tribes*, 55 Interior Dec. 14, 50 (1934).[17] *See* Collins, *Implied Limitations on the Jurisdiction of Indian Tribes*, 54 Wash.L.Rev. 479, 511–13 (1979). Regulatory taxation of tribal nonmembers, "so far as such nonmembers may accept privileges of trade, residence, etc., to which taxes may be attached as conditions," is also clearly a retained power. 55 Interior Dec. at 46. Furthermore, under the tribal constitution, approved pursuant to the Indian Reorganization Act of 1934, 25 U.S.C. § 476, the Tribal Council is given authority to regulate all business and industry on the reservation. The Tribe has authority to enact and enforce ordinances for the "assessment of taxes, licensing and other fees on persons or organizations doing business on the reservation." *Mescalero Apache Tribe Revised Const.* art. 11, § 1(s).

The Tribe's power to regulate those doing business on its reservation directly conflicts with the professed purpose of the New Mexico gross receipts tax: to tax the privilege of engaging in business in New Mexico. N.M.Stat.Ann. § 72–16A–2 (Supp.1975). The State has no cognizable interest in granting or denying the privilege of engaging in business within the reservation. Contradictory regulatory schemes would stifle any hope for the Tribe's economic development. Whether a primarily revenue-raising state tax is preempted by the imposition of a tribal revenue-raising tax is

---

**16.** Even were we to look for the legal incidence of this tax, we perhaps might find that it falls on the Tribe. We are not bound by New Mexico's own characterization of legal incidence. *See Diamond Nat'l Corp. v. State Bd. of Equalization*, 425 U.S. 268, 268, 96 S.Ct. 1530, 47 L.Ed.2d 780 (1976); *United States v. New Mexico*, 581 F.2d 803, 806 (10th Cir. 1978). In addition, with the tax's validity at issue, at least one New Mexico court has, in the alternative, looked beyond the formal legal incidence to the "real taxpayer" in order to uphold the tax. *First Nat'l Bank v. Commissioner of Revenue*, 80 N.M. 699, 705, 460 P.2d 64, 70 (Ct. App.), *cert. denied*, 80 N.M. 707, 460 P.2d 72 (1969), *appeal dismissed*, 397 U.S. 661, 90 S.Ct. 1407, 25 L.Ed.2d 643 (1970). The district court cited *First Nat'l Bank* for its alternative and contrary holding. 439 F.Supp. at 1072 n.23.

**17.** This Interior Department decision was cited with approval, although for other propositions, in *United States v. Wheeler*, 435 U.S. 313, 328, 328 n.27, 98 S.Ct. 1079, 1088, 1089 n.27, 55 L.Ed.2d 303 (1978).

a separate issue, not fully resolved.[18] However, tribal preemption of state regulatory schemes has clear support. *Cf. Warren Trading Post. Co. v. Arizona Tax Commission*, 380 U.S. 685, 690–91, 85 S.Ct. 1242, 1245–1246, 14 L.Ed.2d 165 (1965). *See also United States v. Mazurie*, 419 U.S. 544, 95 S.Ct. 710, 42 L.Ed.2d 706 (1975). Indeed, the regulation by the Tribe "relieve[s] [the State] of all burdens for carrying on those same responsibilities." *Warren Trading Post Co. v. Arizona Tax Commission*, 380 U.S. at 690, 85 S.Ct. at 1245. *See McClanahan v. Arizona State Tax Commission*, 411 U.S. at 170 n.6, 93 S.Ct. at 1261 n.6.

## V.

Imposition of the gross receipts tax on the proceeds of contracts between contractors and the Mescalero Apache tribal government is unsupported in law. Under the doctrine of federal preemption—as supplemented by tribal preemption doctrine and the inapplicability of the legal incidence test—we should reverse that portion of the district court's decision.

## OPINION ON REHEARING

In the *Central Machinery* tractor sale case, *Central Machinery Co. v. Arizona State Tax Comm.*, —— U.S. ——, 100 S.Ct. 2592, 65 L.Ed.2d ——, the Court dealt only with a sale of "goods" on a reservation which was the only significant aspect of the transaction. The majority quoted from 25 U.S.C. § 263, "introduction of goods" into the country belonging to any Indian Tribe; § 264, making it an offense to introduce goods or to trade on a reservation without a license; and 25 C.F.R. § 25.9(b), "itinerant peddlers." The Court said: "One of the fundamental purposes of these statutes and regulations—to protect Indians from becoming victims of fraud in dealings with persons selling goods—. . . ." The tax in *Central Machinery* was exactly the same as considered in *Warren Trading Post Co. v. Arizona Tax Comm'n*, 380 U.S. 685, 85 S.Ct. 1242, 14 L.Ed.2d 165, and the Court concluded that the only difference between this case and *Warren Trading* was that the seller here had no license and no fixed business on the reservation.

In our view, we considered *Warren Trading* fully and the sale of "things" case was not considered to be applicable to our problem. The Court in *Central Machinery* stated:

"The Indian trader statutes and their implementing regulations apply no less to a nonresident person who sells goods to Indians on a reservation than they do to a resident trader."

The Court also there said:

"Since the transaction in the present case is governed by the Indian trader statutes, federal law pre-empts the asserted state tax."

In our previous consideration of *Warren Trading* in the case before us we did not conclude that the matter was controlled by the Indian trader statutes. Thus it would appear that *Central Machinery* adds no new elements or factors not already considered.

*White Mountain Apache Tribe v. Robert M. Bracker*, —— U.S. ——, 100 S.Ct. 2578, 65 L.Ed.2d ——, concerned Arizona's attempt to levy a fuel tax and a motor vehicle tax on the non-Indian entity, Pinetop, which was trucking logs on the reservation to the Indian sawmill. The decision was 6 to 3.

Of the work of Pinetop, Justice Powell in concurring said that Pinetop operated solely and continuously upon an Indian reservation and:

---

18. *See Confederated Tribes of the Colville Indian Reser. v. Washington*, 446 F.Supp. 1339 (E.D.Wash.1978) (three-judge court), *prob. juris. noted*, 440 U.S. 905, 99 S.Ct. 1210, 59 L.Ed.2d 452 (1979). *See also* Barsh, *Issues in Federal, State, and Tribal Taxation of Reservation Wealth: A Survey and Economic Critique*, 54 Wash.L.Rev. 531, 570–72 (1979); Goldberg, *A Dynamic View of Tribal Jurisdiction to Tax Non-Indians*, 40 Law & Contemp.Prob. 166, 186–88 (1976); Comment, *The Case for Exclusive Tribal Power to Tax Mineral Lessees of Indian Lands*, 124 U.Pa.L.Rev. 491 (1975); Note, *Tribal Preemption*, 54 Wash.L.Rev. 633 (1979). There is no question that "Indian self-government . . . includes the power of an Indian tribe . . . to levy taxes." F. Cohen, *Handbook of Federal Indian Law* 122 (1942).

"Pinetop's daily operations are controlled by a comprehensive regulatory scheme. . . . Federal officials direct Pinetop's hauling operations down to such details as choice of equipment, selection of routes, speeds of travel, and dimensions of the loads. . . . Pinetop does all of the hauling at issue in this case over roads constructed, maintained, and regulated by the . . . Tribe and the Bureau of Indian Affairs."

The Court also pointed out that the hauling contractors with the Indians were required to repair existing roads and to build new ones, not the State of Arizona, and this is very expensive for the contractors. Pinetop's business in Arizona was conducted solely on the reservation.

The Court in *White Mountain* said of the preemption argument and the burden:

"The Court has repeatedly emphasized that there is a significant geographical component to tribal sovereignty, a component which remains highly relevant to the pre-emption inquiry; though the reservation boundary is not absolute, it remains an important factor to weigh in determining whether state authority had exceeded the permissible limits. ' "The cases in this Court have consistently guarded the authority of Indian governments over their reservations." ' *United States v. Mazurie,* supra, 419 U.S. [544,] at 558 [, 95 S.Ct. 710, at 718, 42 L.Ed.2d 706] quoting *Williams v. Lee,* 358 U.S. 217, 223 [, 79 S.Ct. 269, 272, 3 L.Ed.2d 251] (1959). Moreover, it is undisputed that the economic burden of the asserted taxes will ultimately fall on the Tribe. Where, as here, the Federal Government has undertaken comprehensive regulation of the harvesting and sale of tribal timber, where a number of the policies underlying the federal regulatory scheme are threatened by the taxes respondents seek to impose . . . ."

And in a footnote:

"Of course, the fact that the economic burden of the tax falls on the Tribe does not by itself mean that the tax is preempted, as *Moe v. Salish & Kootenai Tribes,* 425 U.S. 463 [, 96 S.Ct. 1634, 48 L.Ed.2d 96] (1976), makes clear. Our decision today is based on the pre-emptive effect of the comprehensive federal regulatory scheme, which, like that in *Warren Trading Post Co. v. Arizona Tax Comm'n,* supra, leaves no room for the additional burdens sought to be imposed by state law."

Under the footnote the burden argument is the same as preemption.

With the reexamination of our previous opinion it appears that the elements in both cited cases were considered and evaluated. The Motion for Rehearing is denied.

McKAY, Circuit Judge, dissenting:

In my view *White Mountain Apache Tribe v. Bracker,* —— U.S. ——, 100 S.Ct. 2578, 65 L.Ed.2d —— (1980), and *Central Machinery Co. v. Arizona State Tax Commission,* —— U.S. ——, 100 S.Ct. 2592, 65 L.Ed.2d —— (1980), emphasize the correctness of the position maintained in my dissent and that of Judge Doyle. Therefore I do not concur in the memorandum denying the petition for rehearing, and I would grant rehearing.